22915

The STATE, Respondent v. Earl MATTHEWS, Jr., Appellant.

(373 S. E. (2d) 587)

Supreme Court

*Assistant Appellate Defender Tara Shurling Frick* of *S. C. Office of Appellate Defense,* Columbia, *for appellant.*

*Atty. Gen. T. Travis Medlock, Asst. Attys. Gen., Harold M. Coombs, Jr.,* and *Amie L. Clifford,* Columbia, and *Sol. Charles M. Condon,* Charleston, *for respondent.*

Heard March 7, 1988.

Decided Oct. 24, 1988

HARWELL, Justice:

Appellant Earl Matthews, Jr. was convicted of murder, armed robbery, assault and battery with intent to kill, attempted armed robbery, aggravated assault and battery, and unlawful possession of a pistol. The trial judge sentenced him to death upon the jury's recommendation. In *State v. Matthews*, 291 S. C. 339, 353 S. E. (2d) 444 (1986), this Court affirmed the convictions, reversed the death sentence, and remanded the case for a new sentencing proceeding. The jury impaneled for resentencing also recommended the death penalty based upon its finding of the statutory aggravating circumstance of armed robbery. S. C. Code Ann. § 16-3-20(C)(a)(1)(e) (1985). This case consolidates appellant's direct appeal and our mandatory review of the death sentence pursuant to S. C. Code Ann. § 16-3-25 (1985). We affirm.

## FACTS

On the evening of October 29, 1984, the 16-year-old decedent and her 16-year-old boyfriend were parked in an empty parking lot eating their dinner and talking. Appellant approached the driver's side of the car where the boyfriend was seated. Appellant pulled out a handgun and demanded the boy's money. While the boy was looking through the car for money, appellant struck him across the face, breaking his nose. The boy found five dollars in his girlfriend's purse. At appellant's direction, he put the five dollars back into the pocketbook and handed it to appellant. While appellant was going around to the passenger's side of the car, the decedent locked her door and tried to roll up her window. According to the boy's testimony, appellant prevented her from rolling up the window and said, "Come on, let's take a little ride." When the decedent's boyfriend told him they were not going for a ride, appellant stepped back and cursed, shot the girl in the head, and shot the boy in the chest. The girl was pronounced dead later in a local hospital. The decedent's boyfriend recovered from his chest wound and testified at appellant's trial and at the second sentencing proceeding.

## PRE-SENTENCING
## PROCEEDING MOTIONS

Appellant alleges that the trial court committed numerous errors in denying his pre-sentencing proceeding motions. We address each exception separately.

■ First, appellant asserts the trial judge erred in refusing to submit to *voir dire* examination of his personal views on the death penalty. We disagree.

The trial judge answered four of the ten written questions propounded by appellant as follows: the death penalty was "reenacted" when the judge was in the legislature; he voted in favor of it; he knew no one in the victims' families; and his only knowledge of the case was obtained from a newspaper account two and one-half years earlier. He refused to answer the questions about his "general attitude" toward the death penalty, noting that if he felt "anything less than impartial" he would recuse himself.

This state's capital sentencing scheme contains no provision for *voir dire* examination of a trial judge, nor do we believe one is necessary. A judge's oath requires him to follow and uphold the law in all cases, including capital cases. Had appellant waived the jury and chosen sentencing by the court, the judge would have been required to consider applicable mitigating and aggravating circumstances under Section 16-3-20(C) before imposing a sentence. The judge is entitled to a presumption that he would have done so, regardless of his "personal beliefs" about capital punishment. The judge here did not abuse his discretion in refusing to submit to *voir dire* examination.

■ Next, the trial judge did not abuse his discretion in refusing to allow appellant to ask prospective jurors on *voir dire* "what a life sentence meant to them." Appellant proposed the question to expose those potential jurors with "misconceptions" about the parole eligiblity of a murderer sentenced to life imprisonment.

Appellant has shown neither abuse nor resulting prejudice. The trial judge's final jury instructions properly conveyed the meaning of "life sentence":

> These terms of life imprisonment and the death penalty should be understood in their ordinary and plain meaning by you.

> No other consideration about the effect of the two sentences should enter into your decision about which sentence to impose, and no deliberations and discussions as to any other effect on these sentences should take place in the jury room.
>
> As I said, you simply accept these two, life imprisonment and death penalty, and understand them in their ordinary and plain meaning.

This charge adequately insured a jury interpretation of "life sentence" to mean imprisonment for the duration of appellant's life. Appellant was not entitled to probe potential jurors' misconceptions on this point of law. A contrary conclusion would effectively "constitutionalize" inquiries on potential jurors' interpretations of the reasonable doubt standard, the right to appellate review, or a defendant's failure to testify. *See King v. Lynaugh,* 850 F. (2d) 1055 (5th Cir. 1988) (on rehearing en banc, holding capital murder defendant not constitutionally entitled to question jurors on voir dire concerning possible misconceptions of Texas parole law). Explaining specific legal points and thereby eliminating jurors' misconceptions is the very reason jury instructions exist. There was no abuse of discretion in disallowing the *voir dire* question proposed here.

Appellant also claims the trial judge abused his discretion in refusing to require the solicitor's office to disclose any information, other than criminal records checks, it had gathered on prospective jurors. Appellant had moved for disclosure of criminal records, prior jury service records, and the results of "any other investigation ... concerning backgrounds, attitudes or characteristics" of potential jurors. We find no abuse.

No right to discovery exists in a criminal case absent statute or court rule. *State v. Miller,* 289 S. C. 316, 345 S. E. (2d) 489 (1986). The operative rule here, Rule 8, Criminal Practice Rules, provides that "reports, memoranda, or other internal prosecution documents made by the [solicitor] or other prosecution agents in connection with the investigation or prosecution of the case" are not subject to disclosure. Background information on the *venire,* if any, held by the solicitor here qualified as "internal prosecution" matter connected with the prosecution of the case. As such it was not subject to disclosure.

Nothwithstanding Rule 8, we reject appellant's Due Process attack on the judge's ruling. The record does not reflect that defense counsel was prohibited on *voir dire* from asking potential jurors about prior jury service or exploring their "backgrounds, attitudes, and characteristics." Several potential jurors were directly asked if they had ever served on a jury and answered "no." The *voir dire* here also afforded appellant thorough inquiry into potential jurors' "backgrounds," including where they were contributors to local anti-crime groups, members of a church, or victims of serious crime themselves. The trial judge's refusal to order disclosure here did not prejudice appellant in any manner.

Appellant next alleges the trial court erred in rejecting his request to be sentenced under the 1986 amendment to S. C. Code Ann. Section 16-3-20(A) (1985), which provides for a ten year increase in prison time before a convicted murderer is eligible for parole. We disagree.

Appellant submitted an affidavit admitting his guilt in the murder and the presence of statutory aggravating circumstances. The statute in effect at the time he committed the murder, Section 16-3-20(A) (1985), provided that a life sentence required twenty years service before parole eligibility. In 1986, the statute was amended to provide that where an aggravating circumstance is found, and death is not recommended, the life sentence requires thirty years service before parole eligibility. § 16-3-20(A) (Supp. 1987). Appellant sought leave to waive his right to be sentenced under the effective statute and sought to be sentenced instead under the amendment. He also requested a corresponding jury instruction that, if sentenced to life imprisonment, he would not be parole-eligible for thirty years. Appellant argued that the increased period of incarceration prior to parole eligibility would enable him to argue "additional mitigation, i.e. future non-dangerousness." The court ruled that application of the new statute to appellant's crimes would violate the constitutional prohibition against *ex post facto* laws.

Both the United States and South Carolina constitutions prohibit enactment of any *ex post facto* law. U. S. Const. art. I, §§ 9 and 10; S. C. Const. art. I, § 4. In *Calder v. Bull,* 3 U. S. (3 Dall.) 386, 1 L.Ed. 648 (1798), the United States Supreme Court held as violative of the *ex post facto* prohibition any

"law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Id.* 3 U. S. at 390, quoted in *Miller v. Florida,* 482 U. S. ____, ____, 107 S. Ct. 2446, 2450, 96 L.Ed. (2d) 351, 359 (1987). In *Miller v. Florida,* the Court also quoted *Weaver v. Graham,* 450 U. S. 24, 101 S. Ct. 960, 67 L.Ed. (2d) 17 (1981), in stating the two-element test for determining whether a criminal law is *ex post facto*:

> [T]o fall within the *ex post facto* prohibition, two critical elements must be present: first, the law 'must be retrospective, that is, it must apply to events occurring before its enactment'; and second, 'it must disadvantage the offender affected by it.'

*Id.* ____ U. S. at ____, 107 S. Ct. at 2451, 96 L.Ed. (2d) at 360.

The 1986 amendment would act retrospectively if applied to appellant because it would change the legal consequences of an act he committed before its effective date. Moreover, application of the amendment would disadvantage appellant because it is more onerous than the previous statute. Appellant would face thirty years imprisonment before parole eligibility if he received a life sentence under the 1986 amendment; the applicable statute, however, provides for parole eligibility after only twenty years. The trial court properly ruled that § 16-3-20(A) (Supp. 1987) was an *ex post facto* law as applied to appellant's case.

We also reject appellant's designation of the additional ten years imprisonment under the amendment as "additional mitigation." Appellant's position is fundamentally flawed in its assumption that the punishment for a crime can serve as a mitigating sentencing consideration. That appellant would serve ten additional years before parole eligibility provides no evidence from which "the jury could have drawn favorable inferences ... regarding [his] character and his probable future conduct if sentenced to life in prison." *Skipper v. South Carolina,* 476 U. S. 1, 4, 106 S. Ct. 1669, 1671, 90 L.Ed. (2d) 1, 6 (1986). The judge's refusal to apply the amendment here and instruct the jury on parole eligibility in no way "impeded the sentencing jury's ability to carry out its task of considering all

relevant facets of the character and record of the individual offender." *Id.* at 8, 106 S. Ct. at 1673, 90 L.Ed. (2d) at 9.

Appellant argues that the trial court should have ▮ accepted his waiver of the prohibition against application of the *ex post facto* law and charged the jury on the 30 years/no parole provision pursuant to our decision in *State v. Atkins*, 293 S. C. 294, 360 S. E. (2d) 302 (1987) (holding that in death penalty cases controlled by the Omnibus Criminal Justice Improvements Act of 1986, 1986 S. C. Acts 2955, defendants whose trials proceeded after opinion was published entitled to jury instruction on parole). Appellant can show no prejudice from the refusal to charge parole because (1) his case was not controlled by the Act, and (2) his trial ended four months prior to the effective date of *Atkins.* Further, nothing in *Atkins* even remotely suggests appellant was entitled to application of, or a jury instruction on, law not in effect at the time he committed his crimes.

To accommodate the creation of what appellant designates "additional mitigation," the trial judge would have had to ignore federal and state constitutional prohibitions against *ex post facto* laws. For us to hold that the trial judge was required to accept appellant's waiver and apply the *ex post facto* law would be to fashion a requirement of compliance with a *defendant's* decision as to the appropriate potential sentences, regardless of the sentencing scheme enacted by the legislature. To require acceptance of the waiver—that is, to allow appellant to effectively dictate the sentencing choices—is to ignore the law in effect at the time of the crimes, is not constitutionally required, and is a proposal we are unwilling to accept.

We find no error in the refusal to allow appellant to waive the sentencing statute in effect when he committed the crimes. It follows that the requested jury instruction was also properly refused.

Finally, appellant moved *in limine* to exclude a pho- ▮ tograph showing the car in which the victims were shot. The photograph showed the car parked in front of the boyfriend's house, where he had managed to drive after the shootings. Appellant claims a crumpled white object on the ground near the car is the girlfriend's "bloody

blouse"; the picture, he argues, served only to arouse the passion and prejudice of the jury. This exception is patently meritless.

The relevancy, materiality, and admissibility of photographs as evidence are matters left to the sound discretion of the trial court. *State v. Kornahrens,* 290 S. C. 281, 350 S. E. (2d) 180 (1986), *cert. denied,* 480 U. S. 940, 107 S. Ct. 1592, 94 L.Ed. (2d) 781 (1987). The judge denied the motion to exclude the photograph only after expressly finding that it was not inflammatory. The photograph, taken at night, is very dark. A white object can be seen on the ground beside the car, but it is certainly not identifiable as the victim's "bloody blouse." No state's witness ever identified the object. The photograph was relevant in that it corroborated the testimony of both the boyfriend and the police officer who secured the car and conducted an inventory. The trial judge did not err in admitting this photograph.

## SENTENCING PROCEEDING

Appellant raises two exceptions concerning the introduction into evidence of personal letters seized from his cell after his conviction. Some background information is necessary in addressing these exceptions.

The trial court held a suppression hearing outside the jury's presence. The state opposed defense counsel's motion to suppress the letters by calling two witnesses. Investigator Taylor of the Division of Internal Affairs at the Department of Corrections testified that on June 4, 1985, his office was informed that the solicitor who had originally prosecuted appellant had received a life-threatening letter bearing appellant's name.[1] In order to see if similar letters were in appellant's possession, Taylor ordered an officer to seize all handwritten material from appellant's cell. The officer testified that he turned all the handwritten material over to Investigator Taylor, who forwarded it to SLED.

After extensive argument by counsel, the court denied the motion to suppress. The seized letters were introduced into evidence and four were published, in redacted form, to the

---

[1] The record reflects that the signature was ultimately declared a forgery by an expert handwriting analyst.

jury. In two letters, appellant wrote to friends that if he ever got out of prison he would kill his cousin, who turned him in to police. He added in one letter that he was "glad the bitch [victim] die. I have no feeling for what I did . . ." In another letter, he asked his brother to kill the same cousin.[2] In a letter to his mother, appellant wrote, "When I kill that girl and shot that boy I was crazy and I want to kill someone. I was like a madman. I didn't want to robber them. I wanted to kill them."

First, appellant's reliance on *State v. Ellefson*, 266 ■ S. C. 494, 224 S. E. (2d) 666 (1976) in leveling a First Amendment attack on the letter seizure is unpersuasive. *Ellefson* is readily distinguishable; that case involved a pre-trial detainee whose correspondence was read and copied by a detective for purely investigative reasons and in pursuit of a conviction. Security and death threats were not considerations in the *Ellefson* search as they were here.

Appellant's Fourth Amendment attack is equally un- ■ persuasive. The United States Supreme Court has held that since a prisoner has no expectation of privacy in a cell, "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Hudson v. Palmer*, 468 U. S. 517, 526, 104 S. Ct. 3194, 3200, 82 L.Ed. (2d) 393, 402 (1984). *Hudson* is therefore dispositive of appellant's Fourth Amendment challenge to the search of the cell. *Hudson* also precludes appellant's Fourth Amendment challenge to the seizure of the letters, because the Court noted that

> . . . the same reasons that lead us to conclude that the Fourth Amendment's proscription against unreasonable searches is inapplicable in a prison cell, apply with controlling force to seizures. Prison officials must be free to seize from cells any articles which, in their view, disserve legitimate institutional interests.

*Id.* at 528, n. 8, 104 S. Ct. at 3201, n. 8, 82 L.Ed. (2d) at 406. Even assuming *Hudson* left appellant some qualified right

---

[2] ". . . I want you to do something—I want to ask you to—I know I am asking you to do a lot. I want you to take [him] out for good. Do that for the brother. All right?"

to expect privacy upon which he could base a Fourth Amendment claim, that right would be subordinate to corrections officials' legitimate interest in security under the circumstances of this case. At the time the search and seizure were conducted, the solicitor who prosecuted appellant had recently received a life-threatening letter bearing appellant's name. Prison authorities were notified and took reasonable steps to insure that appellant was neither able to have the threat carried out or to continue to threaten individuals outside the prison. The trial judge did not err in ruling that the scope of the intrusion was slight, the manner in which it was conducted was reasonable, and the reason for the intrusion was adequate. *See State v. Gaskins*, 284 S. C. 105, 326 S. E. (2d) 132 (1985), *cert. denied*, 471 U. S. 1120, 105 S. Ct. 2368, 86 L.Ed. (2d) 266 (1985).

We also reject appellant's bald assertion that the letters were not relevant to any legitimate sentencing consideration. The very purpose of the sentencing phase is to direct the jury's attention to the specific circumstances of the crime and the characteristics of the offender. *State v. Stewart*, 283 S. C. 104, 320 S. E. (2d) 447 (1984). The letters gave the jury insight into both appellant's character and the nature of the crime.

Next, appellant claims two of the letters were improperly redacted and included references to his hope to have his conviction overturned on appeal. This claim is meritless.

Pursuant to appellant's counsel's request, the letters were redacted to delete any reference to either death row or the appellate process. The solicitor and appellant's counsel worked together to redact the letters. The redacted letters were published to the jury; after final instructions, the jury retired. Appellant's counsel then moved to further redact two of the letters, both containing the phrase "if I ever get out of this s___ ." The trial judge denied the request on the ground that the letters containing the phrase had already been published to the jury.

The trial court exercised sound discretion in refusing to further redact the letters. The judge clearly instructed the jury that life imprisonment was to be understood in its plain and ordinary meaning. We do not believe that a reasonable

juror would have seized upon the contested phrase, drawn from it any notions of appeal, or injected into his sentencing decison any arbitrary factor.

Appellant next alleges the court erred in admitting ■ the testimony of Drs. Perot and Sens concerning the condition of the victim's body. We disagree.

Dr. Perot, the neurosurgeon who treated the victim in the emergency room, testified that the victim had a hole in the index finger of her right hand. He used x-rays of the girl's skull to show the entrance wound location and the path of the bullet through the brain. Dr. Sens, the forensic pathologist who performed the autopsy, testified to the path of the bullet and the location of various bullet fragments in the brain. Dr. Sens also opined that the victim's hand was covering the back of her head when she was shot, thus accounting for the hole in the finger.

The medical testimony here was relevant because it was probative of both the circumstances of the crime and appellant's character. This testimony showed the consequences of appellant's firing of the bullet into the victim's head, specifically the type and extent of injuries sustained. The testimony might have reasonably convinced the jury that the victim was covering her head with her hands when she was shot. We reject appellant's characterization of the medical testimony here as "gory" and "gruesome." The testimony was professional, confined to the circumstances of the crime, and not calculated to arouse juror passion or prejudice.

Appellant also claims that a portion of Dr. Perot's ■ testimony necessitated a mistrial. The following exchange is found at the end of the state's direct examination of Dr. Perot:

A: (Con't) After the study was done and the CT Scan was done, which showed the path of the bullet, she was taken back to the emergency room where despite every effort to resuscitate her she died about 12:00 o'clock or three minutes of twelve.

Q. Did you tell [her] family that?

A: Yes, we talked several times.

Q: Is this [the parents]? Would you stand please? ([Parents] standing in courtroom). Is this the family you told?

A: Yes.

Q: All right. Did [the father]—was he able to see his daughter at all. . . .

Defense Counsel: Objection.

The Court: I sustain the objection.

The trial judge agreed with appellant's counsel that the solicitor's request for the victim's parents to stand and his question about the father seeing his daughter were improper. He nevertheless overruled two mistrial motions, ruling that the solicitor's error did not reach "the level of requiring a mistrial upon prejudice." After Dr. Sens's testimony, the judge gave the following jury instruction:

> . . . in regard to the testimony of . . . Dr. Perot, [he] was asked a question by the solicitor in regard to certain members of the deceased's family and the family was asked to stand.
>
> . . . that was an improper question by the solicitor of the Doctor. For that reason, I instruct you, ladies and gentlemen, that you should put that exchange—that question and that response—out of your minds. It should not enter into your discussions in any way and it shouldn't enter into your deliberations in this case at all. . . .
>
> You strictly have to disabuse your minds of that particular exchange. Those are my instructions and you, of course, are expected to follow them.

The ruling on a mistrial motion lies within the sound discretion of the trial court; that ruling will not be disturbed on appeal absent an abuse of discretion. *Wilson v. State*, 276 S. C. 609, 281 S. E. (2d) 128 (1981); *see also State v. Thompson*, 278 S. C. 1, 292 S. E. (2d) 581, *cert. denied*, 456 U. S. 938, 102 S. Ct. 1996, 72 L.Ed. (2d) 458 (1982). The judge correctly ruled that the solicitor's question and request for the parents to stand were improper. We find no abuse of discretion in his refusal to declare a mistrial. In view of the entire record, we believe the judge's forceful instruction cured the improprieties. *Booth v. Maryland*, 482 U. S. _____ , 107 S. Ct. 2529, 96 L.Ed. (2d) 440 (1987), cited by appellant, does not require a different conclusion. The brief references to the victim's family here are clearly distinguishable from the

extensive, passionate displays of grief and anger contained in the victim impact statements of *Booth*. The emotion that rendered *Booth's* victim impact statements constitutionally impermissible for sentencing consideration did not infect appellant's sentencing proceeding.

Appellant next contends that the court erred in prohibiting defense counsel from asking members of appellant's family which sentence *they* thought appellant should receive and what effect imposition of the death penalty on appellant would have on them. This contention is meritless.

First, despite the court's admonishment to appellant's mother to testify only about appellant's character and background and avoid any opinion as to the sentence, she testified that "I want to save my child life," "his life" was worth saving, and "I wish you [the jury] would save my child life." Appellant can show no prejudice because his mother gave her opinion and pleaded for mercy despite the court's ruling.

The trial court properly exercised its discretion in prohibiting appellant's counsel from eliciting the opinions of appellant's other family members concerning the appropriate punishment. The line of questioning prohibited here went to the ultimate issue to be decided by the jury—life imprisonment versus death penalty—and was properly reserved for jury determination. *See State v. Adams*, 277 S. C. 115, 283 S. E. (2d) 582 (1981) (ultimate issue of appropriate sentence reserved for jury decision).

Appellant next excepts to the court's failure to grant a mistrial after the solicitor's closing jury comments.

One of the letters seized from appellant's cell contained the line "I glad the bitch [victim] die." In referring to the letters, the solicitor commented that "I don't know when if ever he changed his mind on 'I glad the bitch die.' " Appellant alleges this was an improper indirect comment on his exercise of the Fifth Amendment right to remain silent and put the state to its proof. *See State v. Johnson*, 293 S. C. 321, 360 S. E. (2d) 317 (1987); *State v. Brown*, 289 S. C. 581, 347 S. E. (2d) 882 (1986). We disagree.

Reviewing this comment in the context of the entire jury argument, *State v. Gaskins, supra*, we find that it did not constitute an impermissible indirect comment on appellant's

right to remain silent. The comment simply did not rise to the level condemned recently in *State v. Cockerham,* 294 S. C. 380, 365 S. E. (2d) 22 (1988). The comment focused on the letters in evidence and not on appellant's failure to testify. Appellant also urges reversal of his sentence based on the solicitor's repetition of the curse allegedly uttered by appellant before he shot the victims. This argument is meritless. The solicitor used the phrase only twice during his jury argument in a detailed review of the boyfriend's testimony on the sequence of events leading to the shootings. The boyfriend's statement to police after the shootings and his testimony at the sentencing proceeding both reflect that this was the curse uttered by the man who shot the couple. Because the argument was limited to a circumstance of the crime, the trial judge properly exercised his discretion in allowing the solicitor's summation to stand. *But cf. State v. Hawkins,* 292 S. C. 418, 357 S. E. (2d) 10 (1987) (where solicitor's excessive and repetitious use of nickname "Mad Dog" in referring to defendant aroused passion and prejudice of jury).

Finally, appellant argues that the court should have charged the jury not to consider the deterrent effect of the death penalty. This argument has previously been rejected by this Court. *See State v. Lucas,* 285 S. C. 37, 328 S. E. (2d) 63 (1985), *cert. denied,* 472 U. S. 1012, 105 S. Ct. 2714, 86 L.Ed. (2d) 729 (1985); *State v. Damon,* 285 S. C. 125, 328 S. E. (2d) 628 (1985), *cert. denied,* 474 U. S. 865, 106 S. Ct. 187, 88 L.Ed. (2d) 156 (1985); *State v. Patterson,* 285 S. C. 5, 327 S. E. (2d) 650 (1984), *cert. denied,* 471 U. S. 1036, 105 S. Ct. 2056, 85 L.Ed. (2d) 329 (1985).

## PROPORTIONALITY REVIEW

Having conducted the sentencing review required by Section 16-3-25 (1985), we conclude that the jury's aggravating circumstance finding is supported by the evidence. The death penalty was not arbitrarily imposed and is proportionate to the penalty in similar cases. *See State v. South,* 285 S. C. 529, 331 S. E. (2d) 775, *cert. denied,* 474 U. S. 888, 106 S. Ct. 209, 88 L.Ed. (2d) 178 (1985). The death sentence is accordingly

Affirmed.

GREGORY, C. J., CHANDLER and FINNEY, JJ., and J. B. NESS, Acting Associate Justice, concur.