481 S.E.2d 125

The STATE, Respondent,

v.

Thomas Treshawn IVEY, Appellant.

No. 24550.

Supreme Court of South Carolina.

Heard Oct. 17, 1996.

Decided Jan. 20, 1997.

Rehearing Denied Feb. 25, 1997.

Deputy Chief Attorney Joseph L. Savitz, III, of South Carolina Office of Appellate Defense, Columbia, for Appellant.

Attorney General Charles Molony Condon, Assistant Deputy Attorney General Donald J. Zelenka, Columbia, and Solicitor Walter M. Bailey, Jr., Summerville, for Respondent.

MOORE, Justice:

Thomas T. Ivey appeals his conviction for murder and his sentence of death. We affirm.

### FACTS

In early January 1993, Ivey and Vincent Neuman escaped from a prison in Clayton, Alabama. Neuman testified that on January 13th, he and Ivey kidnapped Robert Montgomery in Columbia and drove him in his truck to the town of North, South Carolina. There, Ivey shot and killed Montgomery. Ivey and Neuman drove away in Montgomery's vehicle. The next day, Ivey and Neuman stole another vehicle. In the vehicle were the owner's identification and some blank checks.

On January 15th, Ivey, Neuman, and Patricia Perkins drove to Orangeburg in order to forge the blank checks. All three entered a Belk's store where Neuman wrote a check for the purchase of cologne and aftershave. Ivey left the store, but Neuman and Perkins continued to "shop." They tried to purchase certain items costing $279.30. When they tried to pay for the merchandise with a forged check, the clerk became suspicious and said she would have to have the check ap-

proved. Neuman left the store. A store security guard called the police who arrived within a few minutes. Ivey, who had been outside, returned to the store to check on Perkins.

A police officer and an investigator found Ivey and Perkins in the mall and questioned them; however, they told Ivey he was free to go when they realized that Neuman, not Ivey, was the person trying to pass the check. At that time, Orangeburg police officer Thomas Harrison ("Officer") arrived and began questioning Ivey. There was evidence that Ivey's .357 Magnum, which was in his left coat pocket, fired. The bullet hit the ground, ricocheted, and struck Officer. Ivey then pulled the gun out of his pocket and directly shot Officer five more times. After the shooting, Ivey tried to escape. A few officers chased Ivey out of the mall, shooting at him as he zig-zagged into the parking lot where he was finally arrested.

Ivey gave a statement to the police admitting that he killed Officer. He stated that he had a gun in his left coat pocket. While he was talking with Officer, the gun accidently went off, and the shot hit the floor. "[T]he officer jumped back, and he was going for his gun, and I just panicked, and I pulled it out and started shooting." Initially, Ivey said that he shot Officer because he was "scared," but later indicated that "I don't know why I shot the officer."

A forensic pathologist testified that the cause of death was two gunshot wounds to Officer's vital organs. In addition to other wounds, a wound, which exhibited the effects of a ricochet pattern, was found on Officer's right leg. A South Carolina Law Enforcement Department crime scene technician found a projectile or bullet had struck the floor near to where Ivey and Officer were standing. Moreover, there was evidence that Ivey's left coat pocket was blown out by a gunshot.

Ivey was indicted for murder and tried. A jury found Ivey guilty of the murder of Officer. The State sought the death penalty, relying on three aggravating circumstances: (1) The defendant by his act of murder knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person; (2) Thomas C. Harrison, a local law enforcement officer, was murdered during or because of

the performance of his official duties; and (3) Two or more persons, including Thomas C. Harrison, were murdered by the defendant by one act or pursuant to one scheme or course of conduct. *See* S.C.Code Ann. § 16–3–20(C)(a)(3), (7), (9) (Supp. 1995). The jury was also instructed on four statutory mitigating circumstances and nine non-statutory mitigating circumstances.

Finding the existence of the first two aggravating circumstances listed above, the jury recommended a sentence of death. The judge sentenced Ivey to death.

## ISSUES

1. Did the trial court err in refusing to charge voluntary manslaughter?

2. Did the trial court err in allowing Officer's mother to imply that Ivey deserved to die, thereby violating *Payne v. Tennessee* and state law?

3. Did the trial court err in preventing the defense from ensuring that the jury had a correct understanding of what "life imprisonment" meant?

## DISCUSSION

### A. Voluntary Manslaughter

Ivey argues that the trial court erred in refusing an instruction on voluntary manslaughter. We disagree.

Ivey contends that his gun went off accidentally: "... the male officer was standing beside me and the gun was in my left pocket on the inside; and I stuck my hand in there and the hammer was already cocked back, and it went off in my pocket when I had my hand on it." He claims to have shot Officer as the latter was going for his gun: "... and the officer jumped back, and he was going for his gun, and I just panicked and I pulled it out and started shooting...." Ivey also said that he shot Officer because he "was scared." He maintains that because he was in a state of fear and acting in response to Officer going for his gun, that these circumstances entitled him to a charge on voluntary manslaughter.

■ Voluntary manslaughter is the unlawful killing of a human being in sudden heat of passion upon a sufficient legal provocation. *State v. Kornahrens*, 290 S.C. 281, 350 S.E.2d 180 (1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1592, 94 L.Ed.2d 781 (1987). Heat of passion alone will not suffice to reduce murder to voluntary manslaughter. *State v. Tyson*, 283 S.C. 375, 323 S.E.2d 770 (1984), *cert. denied*, 471 U.S. 1006, 105 S.Ct. 1873, 85 L.Ed.2d 165 (1985). Where there are no actions by the deceased to constitute legal provocation, a charge on voluntary manslaughter is not required. *See State v. Butler*, 277 S.C. 452, 290 S.E.2d 1, *cert. denied*, 459 U.S. 932, 103 S.Ct. 242, 74 L.Ed.2d 191 (1982). The exercise of a legal right, no matter how offensive to another, is never in law deemed a provocation sufficient to justify or mitigate an act of violence. *State v. Norris*, 253 S.C. 31, 168 S.E.2d 564 (1969).

■ More specifically, *State v. Linder*, 276 S.C. 304, 278 S.E.2d 335 (1981), states that a lawful arrest or detention in a lawful manner by an officer will not constitute an adequate provocation for heat of passion reducing the grade of the homicide to manslaughter; nor will other lawful acts of officers while in the discharge of their duties constitute adequate provocation. This is precisely the situation we have in the present case. Ivey does not argue, nor is there any evidence, that Officer acted in an unlawful manner in discharging his duties. Even when Ivey's version of the incident is accepted, we find that Officer, by going for his gun, was reacting to Ivey's accidental firing of the weapon. Officer obviously had the right to defend himself. Accordingly, because there was no evidence of sufficient legal provocation, Ivey was not entitled to a voluntary manslaughter charge.

### B. Victim Impact

Ivey argues the trial court improperly allowed certain testimony by Officer's mother in violation of *Payne v. Tennessee* and *State v. Johnson*. We disagree because this argument fails on both procedural and substantive grounds.

■ Procedurally, this argument is barred because Ivey did not specifically object to the testimony. During the testimony of Officer's mother, Ivey's attorney interjected, "Your Honor, I sincerely apologize, but I think we're going out of the bounds

now"; however, he did not raise a specific objection to her testimony. *See State v. Tucker*, 319 S.C. 425, 462 S.E.2d 263 (1995) (appellant objected generally to the introduction of any victim impact evidence, but did not object on specific grounds; therefore, the argument is procedurally barred), *cert. denied*, —— U.S. ——, 116 S.Ct. 789, 133 L.Ed.2d 739 (1996).

However, the argument also fails on the merits. In *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720, 736 (1991), the United States Supreme Court declared:

> We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

Citing *Payne*, this Court, in *State v. Johnson*, 306 S.C. 119, 410 S.E.2d 547 (1991), *cert. denied*, 503 U.S. 993, 112 S.Ct. 1691, 118 L.Ed.2d 404 (1992), rejected the defendant's argument that the solicitor improperly referred to the victim's family. During the penalty phase of that case, the defendant's sister testified that she would visit him at the penitentiary for Christmas. In response, the solicitor stated that the victim's family could not go to see him, but could only visit him at his grave. The *Johnson* Court found that the argument made by the solicitor was relevant to the jury's decision.

In *State v. Rocheville*, 310 S.C. 20, 425 S.E.2d 32, *cert. denied*, 508 U.S. 978, 113 S.Ct. 2978, 125 L.Ed.2d 675 (1993), the State called the victims' parents who testified about their families' reliance on their sons and the boys' dreams and aspirations. The Court rejected the defendant's argument that the statements were improperly admitted, and it reasoned that the evidence served the purpose of showing the specific harm committed by the defendant in the murders and merely portrayed the victims as unique individuals. Similarly, in *Riddle v. State*, 314 S.C. 1, 443 S.E.2d 557, *cert. denied*, 513 U.S. 1003, 115 S.Ct. 518, 130 L.Ed.2d 424 (1994), it was held

that the testimony of the victim's stepdaughter was relevant to establishing the victim as a unique human being and to showing the specific harm committed by the defendant. The stepdaughter had testified about the victim's standing in the community, the victim's grandchildren, and the impact the crime personally had on stepdaughter.

■ Based on the above criteria, the testimony that Ivey contests was properly admitted. The testimony in dispute is as follows:

Q: Could you tell us how your son's death has affected your life?

A: Well, it's certainly left a big void in our lives. I mean, I don't know how to express it, you know, unless—I mean, it's just—We miss him terribly because of the constant relationship we had with him. He was the kind of person that was nearly always in a good mood. He could come by the house, and just the way he came; he'd say, 'Hi, Mama; what's happening,' or 'How's it going' or something like that; just always kind of could cheer us up a little bit and—

Q: What the hardest part now about his death and the way he died?

A: Well, when I think about the way he died, I can't help but feel sort of angry because I just feel like it was so useless.

Mr. Johnson: Your honor, I sincerely apologize, but I think we're going out of the bounds now.

The Court: All right, sir. I'll allow it. Go ahead.

A: Somebody—this man who shot my son—said that he ran out of the store, and when he realized he was going to be arrested, he laid down on the ground and said, 'Don't shoot; don't kill me; don't kill me.' But he didn't think about that when my son was lying on the floor in front of him in the store saying 'Don't do this; don't do this.' And—well, it hurts.

Q: Are there particular occasions that are worse than others?

A: . . . .

Ivey contends that the statements by Officer's mother unmistakably implied that appellant should die for his crime:

She told the jury that it was too late for mercy, that if appellant had wanted to live, he should have thought about that before he killed her son. We disagree. The above testimony simply demonstrates the uniqueness of the victim and the harm that the victim's family has suffered. Officer's mother was simply expressing her grief and pain. Under *Payne* and South Carolina precedents, such testimony was proper.

### C. *Jury's Understanding of "Life Imprisonment"*

Finally, Ivey argues that the court erred by preventing the defense from ensuring that the jury had a correct understanding of the term "life imprisonment," where the solicitor introduced considerations of early release and misled the jury about Ivey's future dangerousness to society, while depicting life imprisonment as a luxury vacation.

█ At oral argument, counsel for Ivey conceded that this argument is unpreserved. However, even if it were preserved, the argument does not succeed on the merits. Defense counsel wanted to ask prospective jurors the following question during voir dire: "What is their conception, their notion, about what life imprisonment means?" The trial court refused to allow the question. *State v. Matthews*, 296 S.C. 379, 373 S.E.2d 587 (1988), *cert. denied*, 489 U.S. 1091, 109 S.Ct. 1559, 103 L.Ed.2d 861 (1989) is dispositive on this issue. In that case, we held the trial judge did not abuse his discretion in refusing to allow the defendant to ask prospective jurors on voir dire "what a life sentence meant to them." Defendant had proposed the question to expose those potential jurors with "misconceptions" about the parole eligibility of a murderer sentenced to life imprisonment. *Matthews* held that the defendant had shown neither abuse nor prejudice and that the trial court's jury instructions had properly conveyed the meaning of "life sentence": "These terms of life imprisonment and the death penalty should be understood in their ordinary and plain meaning by you." *Id.* at 383, 373 S.E.2d at 590. The case stated that defendant was not entitled to probe potential jurors' misconceptions on this point of law.

The question in the present case is nearly exactly the same as that which was asked in *Matthews*. In addition, the trial

court in this case also charged the jury on the meaning of life imprisonment: "I instruct you that when considering the two possible sentences, that is life imprisonment means life imprisonment, and death penalty means the death penalty." Ivey makes no attempt to distinguish *Matthews*.

### D. Proportionality Review

We have conducted a proportionality review pursuant to S.C.Code Ann. § 16–3–25 (1985). The sentence in this case was not the result of passion, prejudice, or other arbitrary factors, and the evidence supports the jury's finding of aggravating circumstances. The sentence is not excessive or disproportionate to the penalty imposed in similar cases. *See State v. South*, 285 S.C. 529, 331 S.E.2d 775 (officer shot and killed by defendant in drive-by shooting), *cert. denied*, 474 U.S. 888, 106 S.Ct. 209, 88 L.Ed.2d 178 (1985); *State v. Young*, 319 S.C. 33, 459 S.E.2d 84 (1995) (victim killed in the course of a robbery), *cert. denied*, —— U.S. ——, 116 S.Ct. 718, 133 L.Ed.2d 671 (1996).

**AFFIRMED.**

FINNEY, C.J., WALLER and BURNETT, JJ., and Acting Associate Justice GEORGE T. GREGORY, Jr., concur.