604 S.E.2d 696

**The STATE, Respondent,**

v.

**David Mark HILL, Appellant.**

No. 25868.

Supreme Court of South Carolina.

Heard Jan. 22, 2004.
Decided Sept. 13, 2004.
Rehearing Denied Nov. 23, 2004.

Assistant Appellate Defender Robert M. Dudek and Jeffrey P. Bloom, both of Columbia, for appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General Melody J. Brown, all of Columbia, and Solicitor Barbara R. Morgan, of Aiken, for respondent.

Chief Justice TOAL:

Appellant was convicted of capital murder and related charges for killing three employees at the Aiken County Department of Social Services (DSS) on September 16, 1996. We affirm appellant's murder convictions and three death sentences, vacate his conviction for attempted murder, and reverse his conviction for burglary.

## FACTUAL/PROCEDURAL BACKGROUND

When these murders took place, appellant was married and had three children: a three-year-old daughter who was a quadriplegic[1] and twin two-year-old boys. DSS became involved with the family because of concern about the parents' abuse of prescription drugs. The children were eventually removed from the home.

On the morning of September 16, 1996, appellant had a telephone conversation with his caseworker, James Riddle. Appellant then called his sister-in-law, Tammy Campbell, to ask for a ride to the DSS office. Tammy and her husband gave appellant a ride to the Business & Technology Center where the DSS office was located. On the way, appellant said that he was tired of people "playing God" with his children. The Campbells dropped appellant off at the front of the building.

---

1. The daughter was injured when appellant's wife had a car accident less than a year earlier.

Sometime before 2:00 p.m., several DSS workers returned to work after a birthday luncheon. Annette Michael was walking towards her cubicle in the DSS office area when another worker, Josie Currie, approached with her hands up. Appellant was behind Josie with a gun. Josie asked Annette where James Riddle's office was. When Annette motioned with her hand, appellant told her to step in behind Josie. The three of them walked down the aisle to James's cubicle. James was seated at his desk speaking on the telephone. Josie stepped into the cubicle and said, "This man would like to see you."

Appellant fired a shot into the cubicle, hitting James in the head. He then pointed the gun over Annette's shoulder and shot Josie in the head. Annette fell with Josie as a third shot was fired. Annette saw James fall over in his chair and she saw a hole in his forehead before she fainted on the floor. Another DSS worker, Michael Gregory, was found dead of a gunshot wound in the men's restroom. Both Josie and James died within the next few hours. Annette was not injured.

The next morning, police were still searching for appellant. At around 9:20 a.m., appellant was found lying on the railroad tracks behind the building with his gun nearby. He had a bullet hole through the roof of his mouth and an exit wound in the top of his skull. Although he was seriously injured, appellant was able to speak. After he was taken to the hospital, he was given *Miranda* warnings. Appellant admitted to the shootings. He said he first shot Michael Gregory in the restroom because Gregory had seen him. He shot James Riddle because Riddle was his caseworker. He shot Josie Currie "because she was black."

At trial, defense counsel conceded appellant was guilty of the shootings and urged that the real issue was the penalty to be imposed. Appellant was convicted of three counts of murder, one count of attempted murder, kidnapping, second-degree burglary, and weapon charges. At the penalty phase, the jury found four aggravating circumstances: (1) murder while in commission of a burglary, (2) kidnapping, (3) two or more persons murdered, and (4) risk of death of two or more persons in a public place. The jury returned three death sentences.

As to the guilt phase of the trial, appellant raises the following issues for review:

1. Did the trial judge properly find appellant competent to stand trial?

2. Did the trial court have subject matter jurisdiction on the attempted murder charge?

3. Did the trial judge properly deny a motion for directed verdict on the burglary charge?

4. Did the trial judge properly admit appellant's statement regarding Josie Currie?

As to the penalty phase, appellant raises the following issues for review:

5. Did the trial judge properly charge section 16–3–20(A) as requested?

6. Did the trial judge properly restrict *voir dire?*

### LAW/ANALYSIS

### 1. Competence

■ Appellant contends the trial judge erred in finding him competent to stand trial because of his memory loss surrounding the murders. We disagree.

■ The test for determining competency to stand trial is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as a factual understanding of the proceedings against him. *State v. Weik,* 356 S.C. 76, 81, 587 S.E.2d 683, 685 (2002), *cert. denied,* 539 U.S. 930, 123 S.Ct. 2580, 156 L.Ed.2d 609 (2003); *State v. Bell,* 293 S.C. 391, 395–96, 360 S.E.2d 706, 708 (1987). The defendant bears the burden of proving his incompetence by a preponderance of the evidence. *Weik,* 356 S.C. at 81, 587 S.E.2d at 685. The trial judge's decision as to whether the defendant is competent to stand trial will be upheld if supported by any evidence. *Id.*

At the competency hearing, Dr. Evans testified appellant had frontal lobe damage from the gunshot wound to his brain and some resulting memory loss after the trauma. Dr. Bellard testified appellant had difficulty with his memory during

the time leading up to the crime but admitted "it is possible [appellant] does remember what happened during the crime." Dr. Bellard further stated appellant understood the charges against him and could follow the proceedings if he paid attention. The State's expert testified appellant was competent.

The trial judge found appellant failed to prove by a preponderance of the evidence that his alleged memory loss rendered him incompetent. The evidence, which indicates that appellant understood the charges and the proceedings, supports this ruling.

### 2. Attempted murder charge

■ Appellant was indicted for assault with intent to kill (AWIK) and "attempted murder" for shooting at Annette Michael, whom he shot at but missed. Because both charges involved the same victim, the State elected to proceed on the attempted murder charge rather than AWIK. The indictment for AWIK was *nol-prossed.* Appellant was convicted of attempted murder and sentenced to life. He contends the trial court did not have subject matter jurisdiction of this charge under this Court's decision in *State v. Sutton,* 340 S.C. 393, 532 S.E.2d 283 (2000). We agree.

In *State v. Sutton,* the Court of Appeals held attempted murder is not a recognized offense in South Carolina. 333 S.C. 192, 194, 508 S.E.2d 41, 42 (Ct.App.1998). This decision was filed October 26, 1998, and we granted certiorari on July 8, 1999. Appellant's trial commenced February 7, 2000. On May 15, 2000, we affirmed as modified the Court of Appeals' ruling in *Sutton,* holding that attempted murder is not a recognized offense in South Carolina. 340 S.C. at 398, 532 S.E.2d at 286.

■ The State argues that in affirming the Court of Appeals, we did not reiterate the Court of Appeals' analysis that such an offense "never existed," but instead clarified the definition of AWIK and concluded the offense of attempted murder is unnecessary. The State claims our decision is therefore a new rule that should apply prospectively only. We disagree. A decision announcing a new rule of law will be given retroactive effect to all cases pending on direct review.

*State v. Jones,* 312 S.C. 100, 102, 439 S.E.2d 282, 282 (1994). Accordingly, we vacate the attempted murder conviction and the five-year sentence for possession of a firearm during the attempted murder.

### 3.  Burglary conviction

■ Appellant was convicted of second-degree burglary under S.C.Code Ann. section 16–11–312(B)(1) (2003), which provides:

(B) A person is guilty of burglary in the second degree if the person enters a building without consent and with intent to commit a crime therein, and either:

(1) When, in effecting entry or while in the building or in immediate flight therefrom, he or another participant in the crime:

(a) Is armed with a deadly weapon or explosive;  or

(b) Causes physical injury to any person who is not a participant in the crime;  or

(c) Uses or threatens the use of a dangerous instrument;  or

(d) Displays what is or appears to be a knife, pistol, revolver, rifle, shotgun, machine gun, or other firearm.

Under section 16–11–310(1)(b), "building" includes a structure where people assemble for purposes of business or government.  Further, the same section states:

Where a building consists of two or more units *separately occupied or secured,* each unit is deemed both a separate building in itself and a part of the main building.

(emphasis added).

Appellant contends the trial judge erred in denying appellant's motion for directed verdict on the burglary charge because there is no evidence he entered without consent.  The State contends the DSS office area was "separately secured" from the public area and, because appellant had no authority to enter that area, his entry was without consent.

The DSS offices are located in the Business & Technology Center, also referred to as the "BTC building."  Glass front doors are at the main entrance to the building and these open onto the main hall that runs down the length of the building with an exit at the end.  DSS has its own outside entrance on

the right side of the building that leads into the DSS lobby. There is also a locked employee entrance that opens directly into the office area of DSS. From the main building hallway, there are two inside entrances to the DSS area, one to the DSS lobby and one to the DSS office area, which apparently was a locked door with a buzzer.

Within the DSS area, there is a door between the lobby and the office area. Typically, clients enter the DSS lobby, and the receptionist calls the DSS worker who comes to the lobby and escorts the client back to the worker's office cubicle. Clients generally are told they are not to go back into the office area unescorted. There is no evidence, however, that this door was locked or even closed on the day of the shootings. In addition, there is no sign posted telling clients not to enter.

Britt Campbell, who gave appellant a ride to the DSS office on the day of the shootings, testified he saw appellant go to the front glass doors of the BTC building, open the door, and take a step inside before Campbell drove away. After the shootings, Appellant himself told police that he "entered the side door and exited the back door." [2] There is no eyewitness testimony indicating how appellant got into the DSS office area. The first time he was seen, he was already in the office area.

The State's theory to support appellant's burglary conviction rests on the statutory definition of "building," which includes a unit in a building that has two or more units where each unit is "separately occupied or secured." S.C.Code Ann. § 16–11–310(1)(b). At least one other court has applied this statutory term to find an area within a building to be separately secured if the unit requires a separate key for entry. *Hawaii v. Vowell,* 9 Haw.App. 307, 837 P.2d 1308, 1311–1312 (1992); *see also State v. Vinyard,* 32 Kan.App.2d 39, 78 P.3d 1196, 1198 (2003) (holding separate businesses in a shopping mall are separate buildings). In light of our rule that a penal statute must be strictly construed against the State, *State v. Muldrow,* 348 S.C. 264, 268, 559 S.E.2d 847, 849 (2002), we

---

2. A maintenance worker saw appellant exit the back door of the building at the end of the main hallway.

construe "separately occupied or secured" to require some objective manifestation that the unit is secure.[3]

In this case, the evidence indicates that at least one entry into the DSS office area was not secured—the entry from the DSS lobby into the office area. There was no sign refusing admittance, no evidence the door was secured, and no evidence appellant was denied entry. We find the DSS office area does not qualify as a separate building for purposes of the burglary statute and reverse the denial of a directed verdict on this charge.

### 4. Admission of statement

Appellant contends his statement that he killed the third victim, Josie Currie, "because she was black," should have been suppressed as an involuntary statement because police told him he was dying and because of his mental condition due to his brain injury. We disagree.

When appellant was found on the railroad tracks, he had a bullet wound in the top of his head. The arresting officers did not tell him he was dying. Agent McAlhany testified he thought appellant was dying but did not tell him. Agent Otterbacher did not recall telling appellant he was dying but did ask him if he believed in God and, if so, he needed to ask God's forgiveness.

Appellant was then taken to the hospital where he was interviewed, with the doctors' permission, after being given *Miranda* warnings. Appellant was coherent and indicated he understood his rights when he gave the contested statement.

A defendant's mental condition in and of itself does not render a statement involuntary in violation of due process. Absent coercive police conduct causally related to a confession, there is no basis for finding a confession constitutionally involuntary. *Colorado v. Connelly*, 479 U.S. 157, 164,

---

3. We are aware that other courts addressing the issue of burglary in a public building have held that consent to enter a public building is limited to the purpose for which the building is open and therefore any unlawful act is without consent as a matter of law. *See, e.g., People v. Blair*, 52 Ill.2d 371, 288 N.E.2d 443, 445 (1972); *State v. Adams*, 94 Nev. 503, 581 P.2d 868, 869 (1978). This approach has been criticized, however, because it elevates every crime committed in a public building, such as shoplifting, to a burglary. *State v. Hall*, 27 Kan.App.2d 313, 3 P.3d 582, 585, *aff'd*, 270 Kan. 194, 14 P.3d 404, 409 (2000).

107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *State v. Hughes*, 336 S.C. 585, 594, 521 S.E.2d 500, 505 (1999); *see also State v. Doby*, 273 S.C. 704, 709, 258 S.E.2d 896, 899 (1979) (under state law, a confession is not inadmissible because of mental deficiency alone).

Agent Ottenbacher's suggestion that appellant ask God's forgiveness does not, on its face, rise to the level of police coercion. In addition, there is no testimony in the record that appellant felt coerced by this statement. Appellant's mental condition alone does not support a finding of involuntariness absent evidence of police coercion. Accordingly, we conclude that the trial judge properly admitted the statement. *State v. Owens*, 346 S.C. 637, 660, 552 S.E.2d 745, 757 (2001) (conclusion of the trial judge on issues of fact as to the voluntariness of a confession will not be disturbed unless so manifestly erroneous as to show an abuse of discretion).

### 5. Section 16–3–20(A)

During the penalty phase of trial, the defense put up an extensive case, including mental health experts who testified as to appellant's mental illnesses [4] and prison officials who testified as to his good behavior while incarcerated.

Captain Angie Pinkney, a shift supervisor at Lee Correctional Institute, described prison conditions for inmates according to their classification. "Safekeepers" are inmates in maximum security. They are kept in lockdown for twenty-three out of twenty-four hours and escorted everywhere. This was appellant's classification. On cross-examination, Captain Pinkney was asked if "general lifers" were treated differently from those in maximum security. She answered that the level of freedom changes and inmates "have much more flexibility out there in the yard, they can leave at their leisure, go to work, school, they have a job...."

When the case was submitted to the jury, the trial judge properly charged that life imprisonment means life without the possibility of parole. After the jury began deliberations, it returned with a question:

[Captain Pinkney] stated something to the fact that with a life sentence Mr. Hill can go to school, work, etc. Please

---

4. Appellant was diagnosed with post-traumatic stress disorder, panic disorder, and major depression.

reiterate the response to the solicitor's question. What's the difference between life in prison and super max.

The trial judge then had Captain Pinkney's testimony replayed. He refused defense counsel's request that an additional charge be given based on S.C.Code Ann. section 16–3–20(A) (Supp.2003), which in pertinent part provides:

A person who is convicted of or pleads guilty to murder must be punished by death, by imprisonment for life, or by a mandatory minimum term of imprisonment for thirty years.... No person sentenced to life imprisonment pursuant to this section is eligible for parole, community supervision, or any early release program, *nor is the person eligible to receive any work credits, education credits, good conduct credits, or any other credits that would reduce the mandatory life imprisonment required by this section.*

(emphasis added). The trial judge ruled that the italicized language expressed only the legislature's intent that the mandatory term not be reduced and does not prohibit a person sentenced to life imprisonment from working or seeking an education.

A plain reading of the statute supports the trial judge's interpretation. The statute speaks strictly in terms of prohibiting *credit* for certain activities but does not prohibit those activities in the day-to-day life of an inmate sentenced to life imprisonment. We find no error in refusing the additional charge.

### 6. Jury *voir dire*

During *voir dire*, the trial judge refused defense counsel's request to ask jurors whether they would give up their vote in order to go with the majority. Appellant contends this was error under *State v. Bennett*, 328 S.C. 251, 493 S.E.2d 845 (1997). We disagree.

In general, the scope of *voir dire* and the manner in which it is conducted are within the trial judges sound discretion. *State v. Wise*, 359 S.C. 14, 23, 596 S.E.2d 475, 479 (2004) (citations omitted). To constitute reversible error, a limitation on questioning must render the trial "fundamentally unfair." *Morgan v. Illinois*, 504 U.S. 719, 730, 112 S.Ct. 2222, 2230, 119 L.Ed.2d 492 (1992); *State v. Hill*, 331 S.C. 94, 104,

501 S.E.2d 122, 127 (1998). On review, a jurors responses must be examined in light of the entire *voir dire*, with the primary consideration being that the juror is unbiased, impartial, and capable of following instructions on the law. *State v. Green*, 301 S.C. 347, 354, 392 S.E.2d 157, 161, *cert. denied*, 498 U.S. 881, 111 S.Ct. 229, 112 L.Ed.2d 183 (1990).

In *Bennett*, we found a juror unqualified who, when asked, stated he could not go against the majority if the eleven other jurors voted for death. We held that the juror's statement indicated he would not have been able to follow the law as explained to him and his earlier generalized statement that he could follow the law did not cure this deficiency. *Bennett*, 328 S.C. at 257, 493 S.E.2d at 848.

But *Bennett* does not determine whether it is appropriate, much less mandatory, for defense counsel to ask the "go with the majority" question. In fact, the appropriateness of the question was not at issue in *Bennett*; instead, the ultimate inquiry in *Bennett* was whether the juror was "unbiased, impartial, and able to carry out the law as explained to him." *Id.* Considering the *voir dire* as a whole, we determined that the juror was not impartial. *Id.*

In the present case, however, a review of the entire *voir dire* reveals that the defendant had an impartial jury. Prior to qualification, the judge asked all potential jurors to read summaries of three potential juror types: (1) one who would feel required to give the death penalty in every case where murder had been proved; (2) one who would not give the death penalty under any circumstance, including when the defendant had been found guilty of murder; and (3) one who would not have his or her mind made up in advance concerning punishment—this person would need to hear the facts and circumstances in aggravation and mitigation, and would want to listen to and follow the law as charged before making a decision. Qualified jurors indicated that they were like the third type of juror—the kind of juror who would listen to all the circumstances and follow the judge's instructions on the law. They were repeatedly questioned by the State and the defense as to whether they understood the nature of this category of potential jurors.

Moreover, there is no indication that the limitation on questioning affected the selection of an impartial jury. Appel-

lant does not point to a single juror whose responses vacillated or whose responses suggested that the juror was incapable of hearing all of the evidence before making a decision. Further, unlike the question asked in *Bennett,* the question asked in the present case does not probe whether jurors would automatically vote for death regardless of their view on the evidence and therefore reveals little, if anything, about juror impartiality. In sum, a review of the entire *voir dire* indicates that the jurors were unbiased, impartial, and capable of following instructions on the law.

In the final analysis, what is constitutionally mandated is the selection of a fair and impartial jury. No particular formula of questions is mandated to achieve this goal. In our justice system, the trial judge has the discretion and the duty to monitor the *voir dire* so as to ensure that the jury selected measures up to the constitutional standard. The judge's ruling in this case, disallowing defense counsel to question jurors about their propensity to go with the majority, did not render the trial "fundamentally unfair." Therefore, we affirm the trial judge's decision on this issue.

## CONCLUSION

Appellant's murder convictions and three death sentences are affirmed, the convictions for attempted murder and the related weapon charge are vacated, and the conviction for second-degree burglary is reversed. Appellant's remaining issues are without merit: *See* Issue 4: *State v. Taylor,* 333 S.C. 159, 508 S.E.2d 870 (1998) (prejudice must be shown from erroneous admission or exclusion of evidence); Issues 8 & 9: *Foye v. State,* 335 S.C. 586, 518 S.E.2d 265 (1999) (jury is presumed to follow instructions); *State v. Prince,* 279 S.C. 30, 301 S.E.2d 471 (1983) (mistrial should not be granted except in cases of manifest necessity); Issue 10: *State v. Colf,* 337 S.C. 622, 525 S.E.2d 246 (2000) (trial judge's ruling on scope of cross-examination will be reversed only if showing of prejudice); Issue 11: *Clark v. Cantrell,* 339 S.C. 369, 529 S.E.2d 528 (2000) (trial judge has broad discretion in determining whether to admit demonstrative evidence including charts and diagrams which are not direct evidence and have only secondary relevance); Issue 12: *State v. Colf,* 337 S.C. at 625, 525 S.E.2d at 247–48 (no reversible error from cross-examination

without showing of prejudice); Issue 13: *State v. Matthews,* 296 S.C. 379, 373 S.E.2d 587 (1988); *State v. Ivey,* 325 S.C. 137, 481 S.E.2d 125 (1997) (where trial judge's instructions defining life imprisonment were sufficient to ensure jurors' proper understanding, the question was properly disallowed); Issue 14: *State v. Hill,* 331 S.C. 94, 501 S.E.2d 122 (1998) (where general question covers the subject of mitigating circumstances, more specific questions need not be allowed); Issue 15: *State v. Council,* 335 S.C. 1, 515 S.E.2d 508 (1999); *State v. Davis,* 309 S.C. 326, 422 S.E.2d 133 (1992) (whether juror is qualified to serve on a death penalty case is within sole discretion of trial judge and is not reviewable on appeal unless wholly unsupported by the evidence); *State v. Tucker,* 334 S.C. 1, 512 S.E.2d 99 (1998) (trial judge's disqualification of a prospective juror will not be disturbed where there is a reasonable basis from which trial judge could have concluded the juror would not have been able to faithfully discharge her responsibilities as a juror).

**AFFIRMED IN PART; VACATED IN PART; REVERSED IN PART.**

BURNETT and Acting Justice JAMES E. BROGDON, Jr., concur.

MOORE, J., dissenting in a separate opinion in which WALLER, J., concurs.

Justice MOORE dissenting.

Because I disagree with the majority's holding that juror voir dire was properly limited, I respectfully dissent.

In my view, our decision in *State v. Bennett,* 328 S.C. 251, 493 S.E.2d 845 (1997), is controlling here. In *Bennett,* we found unqualified a juror who stated he could not go against the majority if the eleven other jurors voted for death. We concluded the juror's earlier generalized statement that he could "follow the law" did not cure this deficiency. Our holding in *Bennett* compels the conclusion that a juror's general statement that he or she could follow the law does not satisfy the specific inquiry defense counsel requested here. *Cf. State v. Hill,* 331 S.C. 94, 501 S.E.2d 122 (1998) (fundamental fairness not violated by limited voir dire where other questions covered request).

Further, as noted by the United States Supreme Court, "The measure of a jury is taken by reference to the impartiality of each individual juror .... each of these jurors must stand equally impartial in his or her ability to follow the law." *Morgan v. Illinois,* 504 U.S. 719, 735, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). A juror's ability to decide the case independently of the majority is particularly relevant under our capital sentencing scheme because even one vote for life will defeat a death sentence. *See* S.C.Code Ann. § 16–3–20 (Supp.2003) (where jury fails to return unanimous verdict, the judge must impose a life sentence).[5] It is therefore crucial that the defendant be able to inquire whether a juror has a propensity to follow the majority.

In light of our sentencing scheme, I would hold that fundamental fairness requires that the defense be allowed to probe a juror's ability to vote independently of the majority. Accordingly, I would reverse and remand for a new sentencing proceeding.

WALLER, J., concurs.

---

5. The jury, however, need not be told the consequences of its failure to agree. *Jones v. United States,* 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). Here the jury was charged it must be unanimous in imposing a life or death sentence.