555 S.E.2d 391

**The STATE, Respondent,**

v.

**Max KNOTEN, Appellant.**

**No. 25373.**

Supreme Court of South Carolina.

Heard May 23, 2001.

Decided Nov. 5, 2001.

Rehearing Denied Dec. 12, 2001.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General Tracey Colton Green, and Solicitor Warren B. Giese, all of Columbia, for respondent.

Assistant Appellate Defendant Robert M. Dudek, of the South Carolina Office of Appellate Defense, of Columbia, for appellant.

PLEICONES, Justice.

Appellant was convicted of two counts of murder, two counts of kidnapping, and one count of first degree criminal sexual conduct in connection with the deaths of thirty-year-old Kimberly Brown ("Kim") and three-year-old Layah Brazil ("Layah"). He received consecutive sentences of life without the possibility of parole for the murder offenses and a consecutive sentence of thirty years for criminal sexual conduct. On appeal, he alleges the trial court erred in refusing to instruct

the jury on voluntary manslaughter in connection with Kim's homicide, in refusing to charge the jury on involuntary manslaughter in connection with Layah's death, and in admitting certain hearsay statements of his mother.

## FACTS

Around noon on Tuesday, November 18, 1997, Cora Brown, Kim's mother, went to her daughter's apartment after receiving no answer to phone calls placed to the apartment and after learning from Kim's employer that Kim had not arrived for work. She found the door to the apartment unlocked, and entered to find blood on the floor, but no sign of Kim, or Layah.[1] Mrs. Brown immediately called the Richland County Sheriff's Department and reported her daughter missing.

The Sheriff's Department began investigating the case as a missing persons incident. After investigators found Appellant's name in Kim's address book, police contacted him on Tuesday night. Appellant told police that he had been at Kim's apartment between 9 and 10 p.m. on Monday evening.

The investigation revealed that Appellant was the last person known to have seen Kim on Monday night, and that Appellant and his family were old and dear friends of Kim and her family.

Wednesday morning, police contacted Appellant at work and asked if he would come to the sheriff's office to speak with investigators. Appellant agreed to do so, and arrived at the office around 11:00 a.m. He again told police he had seen Kim and Layah at Kim's apartment Monday evening, and that he had arrived around 9 p.m. and remained for an hour. He stated that when he left Kim's apartment, he went to a coworker's home and spent the night. When police contacted this co-worker, he provided Appellant with an alibi. Later, the co-worker told investigators that Appellant had not been at his home on the night of the disappearance, but that Appellant had asked him to tell police otherwise.

The investigating officer asked for and received permission to search Appellant's car. Upon inspecting the trunk of vehicle, he discovered what appeared to be blood. Thereafter,

---

1. Layah was Kim's niece and was temporarily residing with Kim.

police resumed questioning Appellant regarding Kim's and Layah's disappearance.

Over the course of the next two days, Appellant gave a number of inconsistent statements to police, each more inculpatory than the last. In the first signed statement, taken between 8:30 and 9:30 p.m. Wednesday evening, Appellant claimed he left Kim's house on Monday evening between 10 and 10:30, that he got in his car, drove away from the apartment complex, and then blacked out. He woke up the next morning at the Rosewood boat ramp and went to work. He said he did not know if he had killed Kim or Layah.

In his second signed statement, given around 1 a.m. Thursday morning, Appellant stated that he and Kim had consensual sex that Monday evening, and afterwards, Kim became agitated. She armed herself with a knife and threatened him. She cut him on the leg [2] and chased him out of the apartment. Appellant, nude in the parking lot, retrieved a foot-long steel bar from the trunk of his car. He reentered the apartment. Kim cut him again, and he hit her over the head with the metal bar. Kim collapsed from the blow. He wrapped her body in a blanket and put her in the trunk of his car. He returned to the apartment, cleaned up, and napped for two hours. He awoke at 5:00 a.m. (now Tuesday morning), got Layah out of bed, and told the child they were going to look for Kim. He drove to a boat landing on Sumter Highway where he disposed of Kim's body. He left Layah at the landing, and went to work.

Appellant gave his final written statement around 11 a.m. Thursday. In that statement he admitted raping Kim. He further admitted pushing Layah into the river. Otherwise, the third statement is largely consistent with the second statement.

Kim's body was discovered by fishermen on Wednesday, November 19, around 5:00 p.m. The State introduced evidence at trial that she had been anally raped, and that she died from either head trauma or, more likely, strangulation.

---

**2.** While questioning Appellant, police observed and photographed a cut on his right leg. According to trial testimony, however, the photograph could not be located, and was unavailable at trial.

The following morning, police discovered Layah's body in the river, sixteen feet from shore. The cause of death was drowning. There were no signs of trauma, or any other injuries to Layah.

The State introduced all three statements at trial. Appellant testified at trial and admitted making all three statements. He said that much of the statements' contents had been suggested to him by the police.

Appellant further testified that a co-worker[3] confessed to him that he killed Kim. The co-worker then threatened to kill Appellant's mother and sister if Appellant informed the authorities. Because he feared for the safety of his mother and sister, Appellant, taking cues from the interrogating officers, fabricated the confessions.

## ISSUE I

Did the trial court err in refusing Appellant's request to instruct the jury on the crime of voluntary manslaughter in the death of Kimberly Brown?

## ANALYSIS

The law to be charged must be determined from the evidence presented at trial. *State v. Cole*, 338 S.C. 97, 525 S.E.2d 511 (2000). In determining whether the evidence requires a charge of voluntary manslaughter, the Court views the facts in a light most favorable to the defendant. *State v. Byrd*, 323 S.C. 319, 474 S.E.2d 430 (1996). "To warrant a court's eliminating the offense of manslaughter, it should very clearly appear that there is no evidence whatsoever tending to reduce the crime from murder to manslaughter." *State v. Cole*, at 101, 525 S.E.2d at 513.

Manslaughter is defined as "the unlawful killing of another without malice." S.C.Code Ann. § 16–3–50 (Supp. 2000); *Carter v. State*, 301 S.C. 396, 398, 392 S.E.2d 184, 185 (1990).

Voluntary manslaughter is the unlawful killing of a human being in sudden heat of passion upon sufficient legal provo-

---

3. Not the same co-worker Appellant previously identified as an alibi.

cation. Heat of passion alone will not suffice to reduce murder to voluntary manslaughter. Both heat of passion and sufficient legal provocation must be present at the time of the killing. The sudden heat of passion, upon sufficient legal provocation, which mitigates a felonious killing to manslaughter, while it need not dethrone reason entirely, or shut out knowledge and volition, must be such as would naturally disturb the sway of reason, and render the mind of an ordinary person incapable of cool reflection, and produce what, according to human experience, may be called an uncontrollable impulse to do violence.

*State v. Cole*, at 101–02, 525 S.E.2d at 513 (internal citations omitted).

■ Even when a person's passion has been sufficiently aroused by a legally adequate provocation, if at the time of the killing those passions had cooled or a sufficiently reasonable time had elapsed so that the passions of the ordinary reasonable person would have cooled, the killing would be murder and not manslaughter. *State v. Hughey*, 339 S.C. 439, 452, 529 S.E.2d 721, 728 (2000).

■ Viewing the evidence in the light most favorable to Appellant, a charge of voluntary manslaughter was warranted here. The State introduced all three of Appellant's written statements at trial. The second statement was as follows: [4]

Q: Can you provide additional information about Kim and Layah?

A: I went over to Kim's about 9:00 p.m. We were talking. Layah was awake. Kim was cooking chicken and corn. Kim fed the baby in the kitchen. Kim and I did not eat. She put the baby to bed. Kim and I went upstairs. We had sex in her bed. I did not use a condom.

Q: Did you ejaculate?

---

**4.** Recall that in his first statement, Appellant claims to have blacked out, and therefore, could not remember what happened after he left Kim's house. In the third statement, he admits to raping Kim, and claims she cut him with the kitchen knife after he raped her. As depicted in the third statement, Kim's homicide would be murder as a matter of law because it was perpetrated during the commission of a felony. Likewise, Layah's homicide would be murder as a matter of law.

A: Yes.

Q: What next?

A: We got up and started washing up. We started talking. I don't know what I said wrong or what happened to her. She got a knife from the kitchen and came back up the stairs. She started threatening me. She chased me down the stairs. I ran out the front door. I did not have on any clothes. She did not have on any clothes. I thought she was kidding. She cut me on the right leg. I went to my car and got a bar. It is about a foot long and silver. It's made out of steel. I pulled the latch in the car and the trunk opened. I got the bar from the trunk. We were in the house near the front door. Kim cut me with the knife then. I hit her with the bar across the head. She feel [sic] and hit the floor. She was crawling the stairs and she collapsed. I rolled her up in a blanket while she was on the stairs. I put her in the trunk. I went back in and tried to clean up. I went to sleep on the floor in the living room. I woke up around 5:00 a.m. I think I feel [sic] asleep around 3:00 a.m. When I woke up, I got Layah out of bed. I washed my hands. Layah walked downstairs and got into the front passenger seat of the car. I told her that we were going to try and find her mom. I was talking about Kim. I drove out and turned onto Sumter Hwy [sic]. I drove until I saw a sign that said "landing." It was to the right of Sumter Highway. I went down to the end by the water. I backed the car up. I took her out. I dragged Kim a few feet. I covered her with a big blanket. I went around and got Layah out of the car. I left her beside the car. I told her I would be back.

Q: What was Layah wearing?

A: A light blue jumpsuit.

Q: What time was it now?

A: About 6:15 a.m. It was dawn.

Q: Where did you go?

A: On to work. I clocked in around 7:20 a.m.

Q: Where is the bar you hit Kim with?

A: I threw it in the woods. I was standing next to Kim when I threw it. It hit a tree.

Q: Was Layah alive when you left?

A: Yes sir.

Q: Is there anything else?

A: No.

The State argues two grounds for affirming the trial court's refusal to charge voluntary manslaughter: first, it contends that the above evidence indicates, as a matter of law, that sufficient "cooling off" time elapsed while Appellant was retrieving the pipe such that he could not have been acting in the heat of passion when he killed Kim; additionally, the State contends that because Appellant recanted the confession at trial, he was not entitled to a charge on voluntary manslaughter.

Appellant argues that because Kim cut him before he struck her with the pipe, the trial court should have instructed the jury on voluntary manslaughter. We agree. Twice in the above statement, Appellant claims Kim cut him. After the first cut, he was chased out of the apartment, went to his car, and got the metal pipe. He reentered the apartment, and killed Kim after she cut him again.[5]

In *State v. Lowry*, 315 S.C. 396, 434 S.E.2d 272 (1993), this Court reversed the Court of Appeals' affirmance of a defendant's murder conviction because the trial court erroneously refused to charge voluntary manslaughter. The Court observed: "Here, there is testimony which, if believed, tends to show that the decedent and Lowry were in a heated argument and that the decedent was about to initiate a physical encoun-

---

5. The uncontroverted evidence was that the outside temperature was near freezing, and according to Appellant's testimony, he was naked when chased from the apartment. Despite this evidence, the dissent argues that Appellant "methodically" retrieved a steel pipe from the trunk of his car, and thus, as a matter of law, sufficient cooling time had elapsed. Likewise, there is no indication in Appellant's second statement that he in any way provoked the knife attack by the victim. Whether or not it is true that the only purpose for Appellant's return to the apartment with the steel pipe was to maliciously harm the victim is an issue to be decided not by this Court, but by a jury. Construing the evidence as we must, in the light most favorable to the Appellant, he armed himself in response to the victim's unprovoked knife attack. Of necessity, he reentered the apartment to gather his clothes and personal effects when he was again attacked by the knife-wielding victim. This constitutes evidence of sufficient legal provocation.

Accordingly, reviewing the evidence in the light most favorable to Appellant, he was entitled to the requested jury charge.

ter when the shooting occurred." *Id.* at 399, 434 S.E.2d at 274.

Were a jury to believe the facts as represented in Appellant's second statement, he and Kim were likewise in a heated encounter and she had twice cut him with a knife when he struck her with the pipe. It follows that a charge on voluntary manslaughter was required.

The cases cited by the State can be distinguished from the case we decide today.

The State cites *State v. Hughey,* 339 S.C. 439, 529 S.E.2d 721 (2000), wherein we held that the trial court did not err in refusing to instruct the jury on the specific examples of "sufficient legal provocation" requested by the defendant. Defendant, in essence, sought a jury charge on the facts as he presented them at trial. We observed that

> Hughey requested the following examples of legal provocation: pulling a knife on a defendant, pointing a gun at a defendant, spitting in a defendant's face, assault of a family member, sudden mutual combat where one of the participants is killed by the other without a previously informed intention to do so, finding one's spouse in the act of adultery, or the deceased having molested a defendant's minor child. The requested examples constitute a direct charge on the facts because Hughey alleges that a knife was pulled on him, Jackson spit in his face, and there was sudden mutual combat. The requested jury charge elevates the specific facts of the case, such as spitting in a person's face, to an acceptable act of legal provocation. Because the requested charge is an instruction on the facts, and the requested charge is fully and fairly covered by the trial judge's general charge, refusal of the requested instruction is not reversible error.

*Id.,* 339 S.C. at 452, 529 S.E.2d at 728. As required by law, the trial court in that case instructed the jury on voluntary manslaughter. The holding of *State v. Hughey* has no application to the instant case.

In *State v. Cole, supra,* we affirmed the defendant's murder conviction despite the trial court's failure to give a requested charge on voluntary manslaughter. We held that the fact that the defendant and a friend of the victim had previously fought

and the victim's friend had pushed over defendant's stereo did not constitute sufficient legal provocation to support a charge on voluntary manslaughter. We further held that there was no evidence that the killing was committed in the sudden heat of passion. We remarked that

> [e]ven if [the defendant] had been in the heat of passion during the confrontation in his apartment, **three to five minutes had passed** in which he had time to go to his mother's apartment and find his gun. Far from passion, these actions indicate "cool reflection." [The defendant] admitted that in the time between when [the victim's friend] and the victim went out the front door and he went out the back, **he had "time enough for me to get my head together."** Most significantly, the men had been gone for several minutes when [the defendant] shot and killed the victim.

*Id.* at 102, 525 S.E.2d at 513 (citation omitted; emphasis added).

The facts of *Cole* are distinguishable from those portrayed in Appellant's second statement. There can be little argument that an unprovoked knife attack constitutes sufficient legal provocation to warrant the requested charge. Furthermore, unlike the facts of *Cole,* here there is no evidence that a significant period of time elapsed between the alleged knife attack and Appellant's striking the fatal blows. Appellant claims he was chased from the apartment by the knife-wielding victim. It was a cold November evening and he was naked. He opened the trunk of his car with the trunk latch and retrieved the pipe. He then reentered the apartment. Kim cut him again, and he responded to the attack by hitting her with the pipe. Viewing this evidence in the light most favorable to Appellant, as we must, there is simply no evidence that, **as a matter of law**, Appellant had sufficient time to cool.

In *Carter v. State,* 301 S.C. 396, 392 S.E.2d 184 (1990), the defendant had been convicted of murder. He sought post-conviction relief on the basis of ineffective assistance of trial counsel. This Court agreed and reversed his conviction. The evidence in that case established that Carter had gone to the victim's home, and while there the two had fought. The victim

struck Carter and ejected Carter from his home. Carter went
to his car, retrieved a knife and returned to fatally stab the
victim. The Court found that based on these facts, a jury
could have found Carter guilty of voluntary manslaughter.
Therefore, the trial court's charge which created a mandatory
presumption of malice and precluded manslaughter prejudiced
Carter and mandated reversal of his conviction.

The facts presented in Appellant's second statement are
nearly indistinguishable from those in *Carter*. A charge on
voluntary manslaughter was clearly warranted.

■ In support of its second argument, that because Appel-
lant recanted his statement he was properly denied the re-
quested voluntary manslaughter charge, the State cites a
single case, *State v. Weaver*, 265 S.C. 130, 217 S.E.2d 31
(1975). In that case, the Court held there was no error in
denying the defendant's request to charge that if the jury
found the arresting officer used unreasonable force in effect-
ing the arrest, the defendant's resistance would not have been
unlawful. At trial, the defendant denied that he resisted
arrest. The officer testified that he did not use unreasonable
force in effecting the arrest. The defendant had made no pre-
trial statement which would have supported the requested
charge. The record contained no evidence that the officer
used unreasonable force, and therefore the requested charge
was not warranted. *See State v. Cole, supra. Weaver* is
distinguishable from the instant case.

Moreover, the State's argument does not accurately reflect
the law of this State. In *State v. Moore*, 245 S.C. 416, 140
S.E.2d 779 (1965), the defendant was charged with, and con-
victed of, assault and battery of a high and aggravated nature.
The trial court refused his requested jury charge on simple
assault and battery, despite testimony that the victim had
received only slight injuries. The defendant testified that he
had been elsewhere when the incident occurred, and under the
defense's theory, he could have been not guilty of even simple
assault and battery. The Court held that the refusal to
charge on the lesser included offense was reversible error.
The Court stated that,

> In determining the issues to be submitted to the jury ... all
> of the testimony, both for the State and the defense, must

be considered.... The fact that the defendant interposed the defense of alibi did not deprive him of the benefit of the reasonable inferences to be drawn from the testimony relative to the degree of the offense committed, for the burden of establishing the offense charged rested upon the State.

*Id.* at 420–21, 140 S.E.2d at 781.

Because there was evidence—in this case introduced by the State—supporting a conviction for the lesser included offense of voluntary manslaughter, we reverse Appellant's conviction in the slaying of Kimberly Brown.

## ISSUE II

Did the trial court err in refusing Appellant's request to instruct the jury on the crime of involuntary manslaughter in the death of Layah Brazil?

## ANALYSIS

Involuntary manslaughter is defined as either (1) the killing of another without malice and unintentionally, but while one is engaged in the commission of some unlawful act not amounting to a felony and not naturally tending to cause death or great bodily harm; or (2) the killing of another without malice and unintentionally, but while one is acting lawfully, with reckless disregard for the safety of others. To warrant the court's elimination of the offense of manslaughter it should very clearly appear that there is no evidence whatsoever tending to reduce the crime from murder to manslaughter. *State v. Burriss*, 334 S.C. 256, 264–65, 513 S.E.2d 104, 109 (1999).

With regard to the offense of involuntary manslaughter, the general assembly has defined "criminal negligence" as the "reckless disregard of the safety of others." Further, a person charged with involuntary manslaughter "may be convicted only upon a showing of criminal negligence" as defined in S.C.Code Ann. 16–3–60 (Supp.2000).

Appellant contends that because in his second written statement, he claims to have left Layah alive and standing by the river after he disposed of Kim's body on the morning of November 18, the trial court was required to instruct on

involuntary manslaughter. He asserts that Layah's kidnapping ended when he drove away from the boat ramp that morning, because the child's "freedom" had been restored at that point in time. We disagree.

While we recognize that kidnapping is a continuing offense, commencing when the victim is wrongfully deprived of freedom and continuing until freedom is restored,[6] we cannot agree that this three-year-old child's freedom was restored where she had been placed in a situation so fraught with peril.

Appellant points to no evidence that Layah's freedom was actually restored. To the contrary, the only evidence that Layah was released indicates that she was released around 6 a.m. a few feet from the edge of a river, that the outside temperature at the time of her release was twenty-four degrees Fahrenheit, and that she was clad only in her pajamas. Viewing these facts in the light most favorable to Appellant, we cannot conclude that Layah's freedom had been restored.

Because there is no evidence in the record to support a charge on involuntary manslaughter in the death of Layah Brazil, we affirm Appellant's murder conviction on that charge.[7]

## ISSUE III

Did the trial court commit reversible error by allowing evidence that Appellant's mother said she knew Appellant was not telling the truth when he denied involvement in the crimes?

## ANALYSIS

■■■ Appellant contends the trial court committed reversible error when it allowed a police officer to testify that Appellant's mother said she did not believe Appellant was

---

**6.** *See State v. Tucker,* 334 S.C. 1, 512 S.E.2d 99 (1999)

**7.** Sadly, we are reminded of the words of Oliver Wendell Holmes, Jr., who in his lecture on the criminal law observed: "... a newly born child is laid naked out of doors, where it must perish as a matter of course. This is none the less murder, that the guilty party would have been very glad to have a stranger find the child and save it." Oliver Wendell Holmes, Jr., The Common Law 53 (1881).

telling the truth when he denied knowledge of Kim's disappearance. At trial, the State presented testimony of Investigator Dave Lawrence. Lawrence was one of the officers who took Appellant's statements and he was the officer who discovered blood in the trunk of Appellant's automobile. Over Appellant's objection, the trial court allowed Lawrence to recount an exchange between Appellant and his mother which took place at the sheriff's office. Lawrence testified as follows:

Q: What was it that Mrs. Knoten told her son in that interview room?

A: She continuously asked him questions about Kim and about Layah. And she immediately just was asking him questions very rapidly. She told Max that he needed to tell the truth and he needed to tell the truth now. She told him that this was not T.V. She said that he needed to cooperate with the investigators, and she told him to help find the baby.

* * * [Defense objects for the second time to this line of questioning and is overruled] * * *

Q: Investigator Lawrence, I believe you were at the part when she indicated, told him that this was not T.V., he needed to cooperate with the investigators to help find the baby?

A: That's correct.

Q: And then start from there.

A: She continued pleading with him. And she told him that he was her son and that she was going to support him and she loved him **but she did not believe him.** She'd asked about the blood that was in his car. He continued—

Q: No, no. Just, she asked about the blood in his car, correct?

A: That's correct. . . .

Appellant contends this exchange constituted inadmissible hearsay because it was offered as proof of the matter asserted, that is, that Appellant's mother did not believe his denial. He further contends the State compounded the argument when, in closing argument, the State referred to Mrs. Knoten's statement: "You heard the testimony that [his mother] looked him in the eyes. Knowing that the blood was found in the trunk of

that car, she took that newspaper article with the picture of Kimberly and Layah. She looked her son in the eyes and said, 'Max, I know you're lying. Tell the truth.' His own mother. And he looked his mother in the eyes and confessed to killing Kimberly Brown. I ask you what more do you need in a court of law?"

The State argues, *inter alia*, that under Rule 801(d)(2)(B) SCRE, the statement was not hearsay. That rule provides "A statement is not hearsay if . . . the statement is offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth." The comments to that section indicate that this rule is consistent with South Carolina law, citing *State v. Sharpe*, 239 S.C. 258, 122 S.E.2d 622 (1961), *rev'd on other grounds, State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991).

The defendant in *State v. Sharpe, supra*, was on trial for assault with intent to ravish. The Court recounted that

After the appellant had been arrested and placed in jail, his mother came to the jail and an officer explained to her why he was under arrest. The mother was then permitted to see the appellant in the presence of an officer and she said: 'Israel, as many colored women as it is in this town why in the world did you go and get messed up with a white woman and you will just have to pay your penalty.' The appellant made no reply to this statement.

Upon the trial of the case, when this testimony was given by the officer, an objection was made to its admission only on the ground that the appellant was not present when the statement was made. The record shows otherwise. The objection was properly overruled. This Court has held that statements in the presence of the accused by a third person are admissible as evidence when such accused remains silent and does not deny such statements. . . . Under this rule, when appellant's mother made the foregoing statement to him and he remained silent and did not deny same, such statement was admissible.

*Id.* at 271, 122 S.E.2d at 628–29 (citations omitted).

We agree that Appellant adopted the statement when he later confessed to the crimes. "A party who has agreed with or concurred in an oral statement of another has adopted

it." 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 801.31[3][b] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2000).

Because Appellant did not refute his mother's statement, and later admitted he was lying when he denied involvement in or knowledge of the offenses charged, his mother's statement was not hearsay. Therefore, there is no merit to Appellant's third issue.[8]

## CONCLUSION

Because a jury instruction on voluntary manslaughter was required based on the evidence presented at trial, we RE-VERSE Appellant's conviction for the murder of Kim Brown. Because, as discussed above, we find no merit in Appellant's other contentions, we AFFIRM Appellant's remaining convictions and sentences.

MOORE and WALLER, JJ., concur.

BURNETT, J., dissents in a separate opinion in which TOAL, C.J., concurs.

Justice BURNETT, dissenting.

I respectfully dissent from that portion of the majority opinion which holds appellant was entitled to an instruction on voluntary manslaughter regarding Kimberly Brown's (the victim's) death. In my opinion, there was no evidence of sufficient legal provocation and, therefore, appellant was not entitled to the charge.

The law to be charged must be determined from the evidence presented at trial. *State v. Cole*, 338 S.C. 97, 525 S.E.2d 511 (2000). In determining whether the evidence requires a charge on voluntary manslaughter, this Court must view the facts in the light most favorable to the defendant. *Id.* To warrant a court's eliminating the offense of manslaughter, it

---

8. It is less clear that the admission of this obviously prejudicial evidence did not violate Rule 402, SCRE (relevance), or Rule 403, SCRE (unduly prejudicial). However, Appellant did not argue these grounds at trial, therefore, we do not consider them on appeal. *See State v. Conyers*, 326 S.C. 263, 487 S.E.2d 181 (1997) (argument not made to trial court not preserved for review).

should very clearly appear that there is no evidence whatsoever tending to reduce the crime from murder to manslaughter. *Id.*

Voluntary manslaughter is the unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation. *State v. Kornahrens,* 290 S.C. 281, 350 S.E.2d 180 (1986). Provocation necessary to support a voluntary manslaughter charge must come from some act of or related to the victim in order to constitute legal provocation. *State v. Locklair,* 341 S.C. 352, 535 S.E.2d 420 (2000). A victim's attempts to resist or defend herself from a crime cannot satisfy the sufficient legal provocation element of voluntary manslaughter. *State v. Shuler,* 344 S.C. 604, 545 S.E.2d 805 (2001). Similarly, "the exercise of a legal right, no matter how offensive to another, is never in law deemed a provocation sufficient to justify or mitigate an act of violence." *State v. Norris,* 253 S.C. 31, 39, 168 S.E.2d 564, 567 (1969).

"[T]he sudden heat of passion, upon sufficient legal provocation, which mitigates a felonious killing to manslaughter, while it need not dethrone reason entirely, or shut out knowledge and volition, must be such as would naturally disturb the sway of reason, and render the mind of an ordinary person incapable of cool reflection, and produce what, according to human experience, may be called an uncontrollable impulse to do violence." *State v. Byrd,* 323 S.C. 319, 322, 474 S.E.2d 430, 432 (1996) (internal quotations omitted). Both heat of passion and sufficient legal provocation must be present at the time of the killing to constitute voluntary manslaughter. *State v. Hughey,* 339 S.C. 439, 529 S.E.2d 721 (2000).

Considered in the light most favorable to the defendant, appellant's second statement does not support a charge on voluntary manslaughter. According to the statement, appellant and the victim engaged in consensual intercourse at her home. Thereafter, the victim became upset and struck appellant once on the leg with a kitchen knife. Appellant left the victim's home, went outside to his car where he opened the driver's door, released the trunk latch, raised the trunk, looked inside, located and removed a foot long steel bar. Appellant returned into the victim's home armed with the steel bar and struck her on the head. After the victim fell to

the floor and attempted to crawl away, appellant rolled her in a blanket and placed her in the trunk of his car. Thereafter, appellant cleaned the victim's home to remove evidence of his crime, then took a two hour nap before dumping the victim's body in a river.[9]

I agree with the majority that the victim's initial assault with the kitchen knife cutting appellant's leg constitutes adequate legal provocation. However appellant's second statement explaining how he methodically obtained the steel pipe from his car trunk reveals that a sufficiently reasonable time between the provocation and killing elapsed during which appellant's passion should have cooled. *See id.*, 339 S.C. at 452, 529 S.E.2d at 728 ("Even when a person's passions were sufficiently aroused by a legally adequate provocation, if at the time of the killing those passions had cooled or a sufficiently reasonably time had elapsed so that the passions of the ordinary reasonable person would have cooled, the killing would be murder and not manslaughter."). Accordingly, the only purpose for appellant's return to the apartment with the steel bar was to maliciously harm the victim. In striking appellant a second time with the kitchen knife, the victim was simply attempting to defend herself against appellant's imminent attack. Her attempt to defend herself from a crime could not give rise to legal provocation.[10] *See State v. Shuler, supra; State v. Tucker*, 324 S.C. 155, 478 S.E.2d 260 (1996); *State v. Tyson*, 283 S.C. 375, 323 S.E.2d 770 (1984); *State v. Norris, supra.* Since there was no evidence of legal provocation, the trial judge did not err in refusing to charge voluntary manslaughter. *State v. Ivey*, 325 S.C. 137, 481 S.E.2d 125 (1997) (where no actions by deceased constitute legal provocation, charge on voluntary manslaughter is not required).

Furthermore, I note the majority relies upon *Carter v. State*, 301 S.C. 396, 392 S.E.2d 184 (1990), to support its

---

9. The pathologist testified the victim incurred two forceful blows to her head which caused her scalp to split. In addition, she was strangled. The pathologist stated while all the injuries occurred close to the time of the victim's death, strangulation was most probably the cause of death.

10. The record indicates, at the time he spoke with police, appellant had one small superficial cut on his leg. Apart from his second statement, there is no evidence the victim stabbed appellant twice.

conclusion appellant was entitled to a voluntary manslaughter charge. While *Carter* is factually similar to the present case, the legal issue in *Carter* was whether the post-conviction applicant was entitled to a *King* [11] charge, not whether voluntary manslaughter should have been submitted to the jury in the first instance. *Carter* is not dispositive of the issue in this case.

I would affirm.

TOAL, C.J., concurs.

---

**11.** *State v. King,* 158 S.C. 251, 155 S.E. 409 (1930), *overruled Brightman v. State,* 336 S.C. 348, 520 S.E.2d 614 (1999).