# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Devin Jamel Johnson, Appellant.

Appellate Case No. 2019-000938

———————————

Appeal From Charleston County
R. Markley Dennis, Jr., Circuit Court Judge

———————————

Opinion No. 5950
Heard April 7, 2022 – Filed November 9, 2022

———————————

**REVERSED**

———————————

Appellate Defender Susan Barber Hackett, of Columbia,
for Appellant.

Attorney General Alan McCrory Wilson, Deputy
Attorney General Donald J. Zelenka, Senior Assistant
Deputy Attorney General Melody Jane Brown, and
Senior Assistant Attorney General W. Edgar Salter, III,
of Columbia; and Solicitor Scarlett Anne Wilson, of
Charleston, all for Respondent.

———————————

**KONDUROS, J.:** Devin Jamel Johnson appeals his conviction of murder. He
contends the trial court erred in admitting into evidence his statement to law
enforcement, removing a juror midtrial, and instructing the jury on accomplice
liability. We reverse.

## FACTS/PROCEDURAL HISTORY

On June 8, 2011, at 10:18 p.m., Akeem Smalls (Victim) was shot while in the courtyard breezeway of Building C at Georgetown Apartments in Charleston County, South Carolina. He died a short time later as a result of being shot. When Victim was shot, he was just outside of an apartment where Sharmaine Johnson lived at the time. Sharmaine[1] was Johnson's sister and Victim's girlfriend. At the time of the shooting, Victim owed Johnson $420.

All four of the fired shell casings discovered at the crime scene were identified as 9mm FC Luger casings. Officers discovered an unfired FC 9mm bullet with Johnson's fingerprint on it in a drawer of a nightstand in Sharmaine's apartment.

Officers interrogated Johnson regarding Victim's shooting. During the interrogation, Johnson initially denied being in Charleston at the time of the shooting. After a few hours of interrogation, Johnson admitted he had been at Georgetown Apartments at the time Victim was shot. Johnson also indicated someone named Creep[2] was with him at the time of the shooting. Johnson stated he saw the shooting, claiming a person named Dee shot Victim and that Johnson and Creep fled the scene out of fear.

Subsequently, officers obtained a search warrant for Johnson's cell phone records, including his historical cell site location information. Verizon provided Johnson's cell phone records, which included call history logs and text messages. The company also supplied cell site location data for outgoing and incoming calls. A grand jury subsequently indicted Johnson for murder and possession of a weapon during the commission of a violent crime.

At trial, the State requested the trial court charge the jury "'the hand of one is the hand of all' . . . because it 'ha[d not] been able to identify a co-defendant.'" *State v. Johnson*, 418 S.C. 587, 591, 795 S.E.2d 171, 173 (Ct. App. 2016) (alteration in original). "The court denied the request, stating it did not 'buy' the State's rationale that the evidence showed two individuals were involved in the crime." *Id.* The

---

[1] Sharmaine is also referred to as Shay in the record.

[2] Johnson told the officers he did not know Creep's last name or contact information but described a tattoo he had. He gave the officers the name of another person who knew Creep and through that person officers located a person known as Creep. However, officers did not believe this was the person Johnson claimed was with him when Victim was shot.

court explained that all of the testimony presented indicated Johnson was the shooter. *Id.* After deliberations began, "the jury asked, '[I]f the other individual pulled the trigger, can the defendant still be guilty?'" *Id.* at 592, 795 S.E.2d at 173 (alteration in original). The trial court determined its prior decision not to charge "the hand of one is the hand of all" was incorrect; Johnson disagreed. *Id.* at 592, 795 S.E.2d at 173-74. "[T]he trial court offered [Johnson] the opportunity to reargue his closing argument before [it] recharged the jury," but Johnson declined and moved for a mistrial. *Id.* at 592-93, 795 S.E.2d at 174. The trial court charged the jury on "hand of one, hand of all" and mere presence. *Id.* at 593, 795 S.E.2d at 174. After the recharge, Johnson asserted the evidence did not support the new charge. *Id.* The jury convicted Johnson of both offenses—murder and the possession of a weapon during the commission of a violent crime. *Id.* at 590, 795 S.E.2d at 172.

Johnson appealed, arguing the trial court erred in "instructing the jury concerning 'the hand of one is the hand of all' because the evidence did not support the instruction" and the timing of the instruction prevented Johnson from addressing the theory in his closing argument, "rendering the trial fundamentally unfair."[3] *Id.* at 588, 795 S.E.2d at 171-72. This court reversed his convictions, finding the trial court's decision to later give the charge fundamentally prejudiced Johnson because he "crafted his closing argument in reliance on the trial court's adamancy" during the charge conference that it would not give the charge. *Id.* at 598, 795 S.E.2d at 177. The court addressed only that issue because it was dispositive. *Id.* at 590, 795 S.E.2d at 172.

The State retried Johnson beginning on April 1, 2019.[4] At the outset of the trial, the court held a *Jackson v. Denno*[5] hearing on the admissibility of Johnson's

---

[3] Johnson also argued "the trial court erred in (1) admitting text messages and historical cell service location information obtained from his cellular service provider by a search warrant" and (2) admitting his statement to investigators. *Johnson*, 418 S.C. at 588, 795 S.E.2d at 171.

[4] In between the time this court issued the remittitur following the first appeal and beginning of this trial in April 2019, a second trial began. At oral argument, both parties were unclear as to what transpired at the second trial other than the State believed it ended in a mistrial.

[5] 378 U.S. 368 (1964).

statement to David Osborne.[6]  Johnson argued the statement was not admissible because it was involuntary due to a combination of factors: the length of time of the interview, his repeated requests for cigarettes, and references investigators made about his daughter.  Following testimony from Osborne, the trial court found the statement admissible.

At trial, Tenika Elmore testified that at the time of Victim's death, she and Johnson lived together in Orangeburg.  Elmore provided that at that time, she worked in North Charleston and Johnson would occasionally drive her or ride with her to work in her car, a blue 2008 Toyota Camry.  The Camry was missing both passenger-side hubcaps.  On the day of the shooting, Elmore, Johnson, and Johnson's six-year-old daughter traveled in Elmore's car to Charleston for Elmore to work.  Johnson and his daughter dropped Elmore off, and she worked all day.  Johnson was alone when he picked her up after work.  Elmore believed he was supposed to pick her up at 11 p.m., but she said he was late, which was normal.  After Johnson and Elmore picked up Johnson's daughter from his mother's house, they stopped at a gas station on the way back to Orangeburg.  Elmore identified Johnson in photos shown to her during her testimony and confirmed that on that night, he was wearing the clothing shown in the photos.  The video surveillance from the gas station showed Johnson wearing a white tank top[7] and dark pants on the evening of the crime.

Osborne testified that during law enforcement's investigation of Victim's killing, officers were interested in one portion of video surveillance from Georgetown Apartments showing a car backing into a parking spot and two men exiting the vehicle and walking toward Building C.  Osborne indicated that about a minute before the shooting occurred, the two individuals walked towards the breezeway, which was the location of the shooting.  The shooting occurred outside of the camera's view.  Osborne provided that seconds after the shooting, the two individuals ran back to the car and fled the complex in it.  He testified the pair was in a hurry when they came back to the car.  He explained the vehicle depicted in the surveillance video was a blue Toyota Camry consistent with the color, make, and model of Elmore's car and both cars were missing the passenger side hubcaps.  He provided he could tell the vehicle in the video was missing hubcaps because of

---

[6] Osborne was a detective for the Charleston Police Department at the time of Victim's killing and investigated the case, which included interrogating Johnson.  At the time of trial, he was no longer a detective; he was an assistant solicitor.

[7] The officers referred to the shirt shown in the video as a white tank top or "wife beater."

the difference in shininess around the wheel area on the two sides of the car. According to Osborne, the driver of the car wore a white tank top and black pants. Osborne testified the only people that could be seen on the videos entering the breezeway area was a man with a dog and the two individuals from the car. He believed the breezeway was the only way to get to the interior of the apartment building without going through an apartment. Osborne was unsure if someone could come in from the pool area. On cross-examination, Osborne acknowledged many cars shown on the security video of the parking lot of the apartment complex had backed into parking spaces. He also agreed the apartment complex security cameras had several blind spots.

Osborne testified about the statement Johnson gave to him. Osborne indicated that for the first four hours of the interview, Johnson claimed he was in Orangeburg at the time Victim was shot. Osborne provided that during the interview, he left the room and allowed Johnson to use Osborne's cell phone. Osborne stated that after Johnson talked on the phone with his mother and Elmore, his story began to change—he admitted being at Georgetown Apartments and indicated he saw the shooting. Based on Johnson's statements, Osborne opined Johnson admitted to being the driver of the vehicle seen in the video.

Robert Holmes testified that he and Victim sold marijuana provided to them by Johnson. Holmes stated Victim stole marijuana valued at about $1,000 from Johnson. Holmes testified that about a week before the shooting, Johnson was looking for Victim and was unhappy with him. On cross-examination, Holmes acknowledged he had told Osborne that Victim had taken $500 worth of marijuana but later gave Johnson money for the marijuana. Holmes also admitted he told Osborne that Victim thought everything was fine between Johnson and himself after that.

Vanessa Morton testified that while watching the news on television, she learned law enforcement was looking for her son Diangelo Bumcum. She indicated she immediately called the police, who then came to her house. She provided Bumcum did not try to run, despite knowing the police were coming and he willingly went with them. Morton told police she would help them search her house and gave the police the clothing her son had been wearing. Police arrested Bumcum for Victim's murder. Morton testified police arrested her son because he was the last person seen with Victim. The charges against Bumcum were later dismissed, and he was released several months after his arrest. Morton identified her son in a photo from about ten minutes before the shooting and indicated he was wearing a white tank top.

Bumcum testified that on the night of Victim's killing, he saw Victim on the porch outside an apartment in Building C of Georgetown Apartments. Bumcum provided he stopped to talk with Victim and their conversation was friendly. On cross-examination, he testified he went inside the apartment to use the restroom. He then left to go to another apartment building in the complex and about thirty to forty-five minutes later, learned Victim had been killed. Bumcum testified he worked at Jiffy Lube performing car services around the time period Victim was killed.

Detective Craig Kosarko testified that at the same time Osborne was questioning Johnson, he was questioning Bumcum. Detective Kosarko stated that at the end of the interview, he collected the shirt Bumcum was wearing during the interview because Bumcum stated he wore it on the day of the shooting. Osborne also participated in Bumcum's interrogation at times. Osborne testified that after talking to Bumcum, he looked at the video from the apartments again and observed someone walking from Building C to Building D about ten minutes before the shooting. He testified that due to the video quality, he had difficulty identifying details of the person's face but the body type of the person shown on the video was consistent with Bumcum's. He indicated the person did not appear to be walking in a hurry. Osborne testified that Bumcum's shirt tested positive for particles of lead, which Osborne attributed to Bumcum's job. Osborne testified that lead is one of three types of particles that need to be detected to identify gunshot reside; the other two being antimony and barium. Osborne provided that all three substances must be present to have a positive test result for gunshot reside. Osborne provided that lead is prevalent in brake pads and Bumcum worked at Jiffy Lube. However, Osborne indicated he never asked Bumcum about it.

Osborne also testified that during the interrogation of Johnson, Detective Kosarko showed Johnson a picture of Bumcum. Osborne indicated that Johnson first stated he did not know the person in the photo. However, Osborne provided that later in the interview, once Johnson admitted being at the apartment complex, he identified Bumcum as the shooter.

Detective Kosarko testified that a series of text messages from Johnson to Terry Stevens from the day Victim was killed showed Johnson was attempting to get Stevens to help him with something. At 4:37 p.m., Johnson texted "i go wet dude ass up da nite." The final message to Stevens, at 9:34 p.m. stated, "i cnt wait on u i gotta handle my bizz."

Detective Kosarko also testified the phone records showed that on the night Victim was killed, ten phone calls were placed to and from Johnson's phone number between 9:01 p.m. and 10:02 p.m. and no phone calls were placed between 10:03 p.m. and 10:34 p.m. Additionally, twelve phone calls were placed between 10:35 p.m. and 11:40 p.m. Detective Kosarko indicated that the phone records also showed Johnson called his sister, Victim's girlfriend, twice at 9:30 p.m. on the evening of the crime. The phone records show the person placing those two calls dialed *67 before dialing the number, which Detective Kosarko explained would prevent the phone number from displaying on the phone of the person receiving the call. The two phone calls lasted twelve seconds and twenty-eight seconds.

Detective Kosarko further testified about a series of text messages between Johnson and his mother the day following the shooting. Johnson's mother texted him asking if he was alright and he responded: "I want to b[e] alrite sha[y] got it all twist up rite now but i kno[w] [yo]u prayin[g]." Later that same day Johnson's mother texted him, "How you mean you want to alright[]. Deal with [yo]urself, maintain your cool let them figure it out you had[ ]nothing to do with it." One minute later, Johnson's mother sent him another text that stated: "Clear all [yo]ur texts."

Elmore testified that "to wet somebody up" means "[t]o shoot them." On cross-examination, when asked if she had stated that "wet or to get wet" also "means to get drunk or intoxicated," she responded, "That's an interpretation, yes." Additionally, she confirmed she had not "heard [Johnson] say get wet meaning to stab or shoot somebody." She agreed Johnson used that term to mean intoxicated. Holmes testified that "to wet somebody up" means to shoot the person. On cross-, redirect, and recross-examination, he explained the terms wet and "wet up" are two different things; that getting wet means to get drunk or intoxicated, whereas wetting someone up means to shoot that person. Additionally, Osborne testified that based on his experience, to wet somebody up means "you're going to shoot somebody," explaining "when you shoot somebody multiple times, they bleed and then they get wet." Osborne also clarified, "Wet somebody up is different than get wet. Get wet is getting high. Wet somebody up or wet them up is shoot somebody." Detective Kosarko also stated that to wet somebody up meant to shoot or kill someone, describing "when you shoot somebody, their clothes get wet from the blood."

During the State's case, an issue arose with a juror; initially, the trial court was concerned the juror possibly had fallen asleep and later, the juror informed the

court he knew one of the witnesses who had testified.[8]  After the court spoke to the juror and the parties argued about whether the juror should be excused, the trial court stated it was excusing the juror because the State provided it would have exercised a preemptory challenge if the juror had indicated during voir dire he knew one of the witnesses.

Prior to the trial court charging the jury, Johnson asked the trial court if it planned to charge the jury on accomplice liability.  The trial court stated it was going to charge the jury on "what is the hand of one."  Johnson replied he was objecting to that language being included in the charge.

Following closing arguments, the trial court charged the jury.  The charge included the following language:

> Now, in conjunction with the crime of murder, I would charge you of this principle of law.  It's called the hand of one is the hand of all.
>
> If a crime is committed by two or more people who are acting together in committing a crime, the act of one is the act of all.  A person who joins with another to accomplish an illegal purpose is criminally responsible for everything done by the other person which occurs as a natural consequence of the acts or act done in carrying out the common plan or purpose.  If two or more people are together, acting together, assisting each other in committing the offense, the act of one is the act of all.
>
> Now, prior knowledge that a crime is going to be committed without more is not sufficient to make a person guilty of the crime.  Mere knowledge or merely being present by another person and the crime is committed, that's not sufficient to convict a person of the crime.
>
> In order to convict the defendant -- even if the defendant was present when it is committed, is not sufficient to

---

[8] The juror knew the witness by a different last name than the one the trial court listed during voir dire.

convict. You must -- guilt is -- to convict the defendant as a principal, a principal is proven by showing an actual or constructive presence at the scene as a result of a prior arrangement. Therefore, finding a prior arrangement, plan or common scheme is necessary for a finding of guilt as a principal.

The State must prove beyond a reasonable doubt by competent evidence that the theory of the hand of one is the hand of all. A principal in a crime is one who either actually commits the crime or who is present aiding, abetting or assisting in committing the crime.

When a person does an act in the presence of and with the assistance of another, the act is done by both. Where two or more are acting with a common plan or scheme or intent are present at the commission of the crime, it does not matter who actually commits the crime. All are guilty.

And of course, as with any other aspect, the State has to prove each of those facts that we just discussed beyond a reasonable doubt. That means you are firmly convinced.

After the trial court charged the jury, Johnson objected:

I just wanted to note on the record that we are objecting to the hand of one/hand of all charge.

We don't believe that the State has presented any evidence that the person that . . . Johnson was with that night was the shooter. I think the evidence that they presented exclusively in this case was the fact that . . . Johnson was the shooter, and I will say that I believe I gave a softball to . . . Osborne when I asked him whether or not he would serve a murder warrant on the person once he found out who he was and he did say no, that is tricky because he's a passenger and I would want to find out his involvement in this case before I did that.

So I think even their own State's witness said we don't have enough to say he's involved or not, and that's why I think the [c]ourt should have declined to read that hand of one/hand of all charge.

The trial court responded:

And while I agree with you that certainly there was a lot of indication of that in this particular case, I truly believe the hand of one/hand of all is most appropriate, especially with the fact that we have -- well, the evidence.

Of course, we have the evidence, if the jury believes it, of course, that . . . Johnson -- in taking instruction that the State has presented that he was intending to go kill him, go shoot him. Whether he died or not, I don't know if that was necessarily it. Probably making him bleed I think was what the typical literal statement of the vernacular, but that part of it and then getting somebody to assist him, that seems to imply I want to get somebody and maybe he didn't want to do it himself. Maybe he wanted somebody else to be the shooter, but he was going to assist. So I believe all of that really falls into that accomplice part of being participating and so I respect your position, but I think it's appropriate under the evidence of this case.

During deliberations, the jury sent a note that asked: "Does the 'hand of one' apply to the possession of a weapon during the commission of a violent crime?" In response, the trial court provided the jury with the following additional instruction:

If the State has proved beyond a reasonable doubt that the murder has been committed, then in order to have a conviction for the hand of one/hand of all, the State would also have to prove beyond a reasonable doubt that . . . Johnson had possession of a firearm at the time that that murder was committed.

In other words, hand of -- you can't -- assuming just for the sake that there were two people and three people, whatever, the person -- in order to be convicted, the hand of one doesn't apply to anything but the murder. It does not apply to the -- to the firearm possession. You have to prove actual possession of that in order to return a verdict of guilty.

After returning to deliberations, the jury convicted Johnson of murder but acquitted him of the weapons charge. The trial court sentenced him to thirty-six years' imprisonment, with credit for time served of 2,604 days. Johnson filed a motion for a new trial, arguing the trial court erred in charging the jury on accomplice liability. Following a hearing, the trial court denied the motion. This appeal followed.

**STANDARD OF REVIEW**

"In criminal cases, the appellate court sits to review errors of law only." *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). Thus, an appellate court "is bound by the trial court's factual findings unless they are clearly erroneous." *Id.* "An appellate court will not reverse the trial [court's] decision regarding a jury charge absent an abuse of discretion." *State v. Commander*, 396 S.C. 254, 270, 721 S.E.2d 413, 421-22 (2011) (quoting *State v. Mattison*, 388 S.C. 469, 479, 697 S.E.2d 578, 584 (2010)). "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *State v. Scott*, 414 S.C. 482, 486, 779 S.E.2d 529, 531 (2015) (quoting *State v. Laney*, 367 S.C. 639, 643-44, 627 S.E.2d 726, 729 (2006)).

**LAW/ANALYSIS**

Johnson argues the trial court violated his due process rights by instructing the jury on the theory of accomplice liability, specifically the hand of one is the hand of all because the State presented no evidence Johnson acted in concert with another.[9] We agree.

_____

[9] As a threshold matter, the State submits that Johnson's assertion of a due process violation misunderstands the function of the Due Process Clause because the appropriate inquiry is whether the trial court abused its discretion in giving an accomplice liability instruction because this instruction is not required by the Due Process Clause. The fact that Johnson mentioned that his due process rights were

"Generally, the trial [court] is required to charge only the current and correct law of South Carolina." *State v. Brown*, 362 S.C. 258, 261, 607 S.E.2d 93, 95 (Ct. App. 2004). "The law to be charged must be determined from the evidence presented at trial." *Barber v. State*, 393 S.C. 232, 236, 712 S.E.2d 436, 438 (2011) (quoting *State v. Knoten*, 347 S.C. 296, 302, 555 S.E.2d 391, 394 (2001)). If any evidence supports a jury charge, the trial court should grant the request. *Brown*, 362 S.C. at 262, 607 S.E.2d at 95. A charge is correct if it adequately explains the law and contains the correct definition when read as a whole. *State v. Brandt*, 393 S.C. 526, 549, 713 S.E.2d 591, 603 (2011). "In reviewing jury charges for error, we must consider the court's jury charge as a whole in light of the evidence and issues presented at trial." *Id.* (quoting *State v. Adkins*, 353 S.C. 312, 318, 577 S.E.2d 460, 463 (Ct. App. 2003)). If jury instructions as a whole "are free from error, any isolated portions [that] may be misleading do not constitute reversible error." *State v. Aleksey*, 343 S.C. 20, 27, 538 S.E.2d 248, 251 (2000). "A jury charge [that] is substantially correct and covers the law does not require reversal." *Brandt*, 393 S.C. at 549, 713 S.E.2d at 603.

"To reverse a criminal conviction on the basis of an erroneous jury instruction, we must find the error was a prejudicial error." *State v. Bowers*, 436 S.C. 640, 646, 875 S.E.2d 608, 611 (2022). "Prejudicial error in a jury instruction is an error that contributed to the jury verdict." *Id.* Should an appellate court find a jury charge erroneous, the court must then decide if the charge affected the jury's deliberations, contributing to the verdict. *See id.* If the appellate court has "any reasonable doubt as to whether the erroneous charge contributed to the verdict," it must reverse the conviction. *Id.* at 647, 875 S.E.2d at 611.

"[S]ome principles of law should not always be charged to the jury." *State v. Perry*, 410 S.C. 191, 202, 763 S.E.2d 603, 608 (Ct. App. 2014); *see also State v. Burdette*, 427 S.C. 490, 503, 832 S.E.2d 575, 583 (2019) (stating some matters allowed during jury argument should not be included in the jury charge). "Instructions that do not fit the facts of the case may serve only to confuse the jury." *State v. Blurton*, 352 S.C. 203, 208, 573 S.E.2d 802, 804 (2002); *see also id.* at 205, 208 n.1, 573 S.E.2d at 803, 804 n.1 (reversing a conviction even though a jury charge was a correct principle of law because it "was not warranted by the facts adduced at trial").

---

violated by the jury charge is of no matter. Johnson provides that the standard of review applicable here is that of reviewing a jury charge and is for the abuse of discretion. He does not mention due process again.

"The doctrine of accomplice liability arises from the theory that 'the hand of one is the hand of all.'" *State v. Reid*, 408 S.C. 461, 472, 758 S.E.2d 904, 910 (2014) (quoting 23 S.C. Jur. *Homicide* § 22.1 (2014)). "Under this theory, one who joins with another to accomplish an illegal purpose is liable criminally for everything done by his confederate incidental to the execution of the common design and purpose." *Id.* "A person must personally commit the crime or be present at the scene of the crime and intentionally, or through a common design, aid, abet, or assist in the commission of that crime through some overt act to be guilty under a theory of accomplice liability." *Id.* at 472-73, 758 S.E.2d at 910. "Accordingly, proof of mere presence is insufficient, and the State must present evidence the participant knew of the principal's criminal conduct." *Id.* at 473, 758 S.E.2d at 910. "If 'a person was "present abetting while any act necessary to constitute the offense [was] being performed through another," he could be charged as a principal—even "though [that act was] not the whole thing necessary."'" *Id.* (alterations in original) (emphases omitted) (quoting *Rosemond v. United States*, 572 U.S. 65, 72 (2014)).

In *State v. Washington*,[10] our supreme court determined the trial court erred by instructing the jury on accomplice liability. 431 S.C. 394, 397, 848 S.E.2d 779, 781 (2020). The supreme court provided "an alternate theory of liability may not be charged to a jury 'merely on the theory the jury may believe some of the evidence and disbelieve other evidence.'" *Id.* at 409, 848 S.E.2d at 787 (quoting *Barber*, 393 S.C. at 236, 712 S.E.2d at 438). The supreme court explained that "[f]or an accomplice liability instruction to be warranted, the evidence must be 'equivocal on some integral fact and the jury [must have] been presented with evidence upon which it could rely to find the existence or nonexistence of that fact.'" *Id.* at 407, 848 S.E.2d at 786 (second alteration by court) (quoting *Barber*, 393 S.C. at 236, 712 S.E.2d at 439). The supreme court noted the record in that case contained evidence the defendant was the shooter but also contained evidence he was not the shooter. *Id.* Accordingly, the supreme court held that "[t]he question becomes whether there was equivocal evidence the shooter, if not [the defendant], was an accomplice of [the defendant]." *Id.*

---

[10] Johnson's brief mentions this court's *Washington* opinion and noted that the supreme court had granted the petition for certiorari and heard arguments. No opinion had been issued at the time of the filing of the briefs. Johnson provided the supreme court's opinion to this court as a supplemental authority.

The supreme court examined the case of *Wilds v. State*,[11] in which this court affirmed the finding that the trial court erred by giving an accomplice liability jury charge. *Washington*, 431 S.C. at 409-10, 848 S.E.2d at 787. The supreme court observed that this court in *Wilds* noted no evidence was presented that anyone other than the defendant was the shooter. *Washington*, 431 S.C. at 409, 848 S.E.2d at 787 (citing *Wilds*, 407 S.C. at 439-40, 756 S.E.2d at 390-91). The supreme court in *Washington* posited that the jury, like the jury in *Wilds*, may have doubted the testimony from the only possible accomplice that he did not shoot the victim. *Id.* at 410, 848 S.E.2d at 787. However, the supreme court found to warrant an accomplice liability jury instruction, some evidence must have been presented that the possible accomplice shot the victim. *Id.* The supreme court held because neither party presented such evidence, the trial court erred by giving the accomplice liability jury instruction. *Id.* at 403, 410-11, 848 S.E.2d at 784, 787-88.

Recently, in *State v. Campbell*, this court decided whether an accomplice liability instruction was improperly given.[12] 435 S.C. 528, 868 S.E.2d 414 (Ct. App. 2021), *cert. granted*, S.C. Sup. Ct. Order dated Sept. 8, 2022. In that case, this court found the trial court had erred in giving the instruction and reversed the conviction. *Id.* at 541, 868 S.E.2d at 421. This court provided:

> Based on the evidence presented at trial, only Richardson could have been [the defendant's] accomplice. On the day of the shooting, Richardson rode with [the defendant] from North Charleston to [the location of the shooting], parked the car for [the defendant], and drove [the defendant] back to North Charleston. Like in *Wilds* and *Washington*, the jury could have doubted Richardson's testimony that he was not involved in a common plan or scheme with [the defendant] to carry out the shooting. Nevertheless, neither party presented evidence that Richardson and [the defendant] had joined together in a common plan or scheme to carry out the shooting. Indeed, Richardson testified he did not know [the defendant] was going to drive to [the shooting location] or why [the defendant] asked him to park the car on [a particular s]treet.

---

[11] 407 S.C. 432, 756 S.E.2d 387 (Ct. App. 2014).

[12] Johnson has provided this opinion as a supplemental authority.

*Campbell*, 435 S.C. at 540, 868 S.E.2d at 421.

This court further explained:

> Even if Richardson's involvement was equivocal evidence he and [the defendant] worked together to carry out the shooting, the Record must have also contained some evidence Richardson was the shooter for the accomplice liability instruction to be proper; it did not. Again, the jury could have doubted Richardson's testimony that he was not the shooter. Still, while security footage showed Richardson walking in [the shooting location] around the time of the shooting, it also showed him walking without a rifle, wearing a white T-shirt and ball cap rather than a hoodie, and getting into the gold Buick rather than a lime green car. Consequently, Richardson does not meet the description of the man seen by [a witness].

*Id.* at 541, 868 S.E.2d at 421.

This court determined because "neither party presented evidence that either [the defendant] was working with the man seen by [the witness] or that Richardson was the shooter," the trial court erred by giving an accomplice liability jury instruction. *Id.*

"Generally, motive is not an element of a crime that the prosecution must prove to establish the crime charged, but frequently motive is circumstantial evidence . . . of the intent to commit the crime when intent or state of mind is in issue." *State v. Sweat*, 362 S.C. 117, 124, 606 S.E.2d 508, 512 (Ct. App. 2004) (omission by court) (quoting Danny R. Collins, *South Carolina Evidence* 319 (2d ed. 2000)).

The trial court here erred in giving the accomplice liability jury charge. The State's theory of the case was that Johnson and the passenger in his car killed the Victim. No eyewitness testified that he or she saw the Victim being shot. Johnson provided in his statement to the police that he saw one person shoot Victim, and he identified Bumcum as that shooter when law enforcement showed him a photo of Bumcum. The record shows a car with two men in it backed into a parking space, which Osborne suggested the individuals were "trying to get out in a hurry." The two individuals walked together toward the crime scene, remained for a few

seconds, and quickly ran back to the car together and fled the complex. Osborne opined Johnson and another male were the individuals in the vehicle seen in the video. The car seen in the video is consistent with the car Johnson was known to be driving that night. From the video, the clothing of the driver of the car matched the clothing Johnson was wearing that night. Johnson admitted in his statement that he was at the apartment complex and present at the shooting. Cell phone data also placed Johnson at the complex. Further, Johnson admitted Creep was with him at the time of the crime. The State's entire theory of the case was that Johnson was the shooter.

The State presented evidence Victim owed Johnson a debt. The State also introduced text messages that Johnson was going to wet someone up, which meant to shoot or kill a person. The Record contains no evidence that Johnson recruited anyone to actually shoot Victim; any evidence of recruiting as shown in the text messages is to assist or accompany Johnson.

An accomplice liability charge was not proper because the evidence is *not* equivocal as to whether Johnson or Creep was the shooter—all the evidence presented only went to Johnson being the shooter; no evidence was presented of Creep being the shooter. *See Barber*, 393 S.C. at 236, 712 S.E.2d at 439 ("Like a lesser-included offense, an alternate theory of liability may only be charged when the evidence is equivocal on some integral fact and the jury has been presented with evidence upon which it could rely to find the existence or nonexistence of that fact. We find the sum of the evidence presented at trial, both by the State and defense, was equivocal as to who was the shooter. Thus, the charge on accomplice liability was warranted."). Additionally, although the record contains little evidence Bumcum was the shooter, to the extent that Bumcum could have been the principal, the State presented no evidence Johnson was working with him.

The weapons charge of which the jury acquitted Johnson states it applies when "a person is in possession of a firearm or visibly displays what appears to be a firearm . . . during the commission of a violent crime and is convicted of committing or attempting to commit a violent crime." S.C. Code Ann. § 16-23-490(A) (2015). The record establishes Victim died from being shot with a firearm. For the jury to acquit Johnson of the weapons charge, it must have found the State did not meet its burden of proving Johnson actually shot Victim and therefore, only found him guilty of murder due to the theory of accomplice liability. Therefore, the charge prejudiced Johnson.

**CONCLUSION**

The trial court erred by charging the jury on accomplice liability and that error prejudiced Johnson.[13] Accordingly, Johnson's conviction of murder is

**REVERSED.**

**WILLIAMS, C.J., and VINSON, J., concur.**

---

[13] Because this issue is dispositive, we need not reach Johnson's issues regarding the voluntariness of his statement and the juror disqualification. *Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (noting an appellate court need not review remaining issues when its determination of a prior issue is dispositive of the appeal).